1  The Honorable Ronald B. Leighton

2

3

4

5

6

7  UNITED STATES DISTRICT COURT FOR THE
   WESTERN DISTRICT OF WASHINGTON
8  AT TACOMA

9

10 UNITED STATES OF AMERICA,              No.  CR15-5198RBL

11                    Plaintiff,

12          v.                            GOVERNMENT'S MOTION FOR
                                          INQUIRY CONCERNING POTENTIAL
13 TROY X. KELLEY,                        CONFLICTS OF INTEREST

14                    Defendant.

15

16      Comes now the United States of America, by and through Annette L. Hayes,

17 United States Attorney for the Western District of Washington, and Andrew C. Friedman,

18 Katheryn Kim Frierson, and Arlen R. Storm, Assistant United States Attorneys for said

19 District, and files this Government's Motion for Inquiry Concerning Potential Conflicts

20 of Interest.

21                           **I.  INTRODUCTION**

22      The Government respectfully requests that the Court conduct an inquiry into

23 potential conflicts of interest that could affect the ability of Defendant, Troy Kelley's,

24 counsel, Mark Bartlett, to represent him in this case.  The Government expects that part

25 or all of the inquiry that the Government is seeking would be conducted *ex parte*, since

26 the inquiry would involve questions concerning attorney-client communications.  The

27 Government requests that – following the inquiry and to the extent possible – the Court

28

GOVERNMENT'S MOTION FOR INQUIRY CONCERNING POTENTIAL
CONFLICTS OF INTEREST/KELLEY (No. CR15-5198RBL) - 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  provide the parties the results of that inquiry, following which the parties should be

2  permitted to brief the effect of any conflicts upon defense counsel's continued

3  representation.

## II.  FACTS

4

5      Kelley is charged with a series of crimes stemming from his operation of a

6  business, United National, LLC, d/b/a Post Closing Department, during the years leading

7  up to and including 2008.  The majority of the potential conflicts of interest at issue relate

8  to a pot of money that included at least $1.4 million that Kelley stole through his

9  operation of Post Closing Department, and that is involved in a number of the crimes

10 with which Kelley is charged.  The most significant potential conflicts stem from

11 Kelley's recent transfers of the money remaining in the pot:  $447,421 to the United

12 States Treasury and $908,397 to the trust account of the law firm of Davis Wright

13 Tremaine LLP.

14 **A.      The Stolen Money**

15     As set forth in the Indictment, Post Closing Department provided reconveyance-

16 tracking services to escrow companies.  Indictment ¶ 5.  Individuals who borrow money

17 to purchase or refinance a home generally are required to transfer title to the home to a

18 trustee, who holds that title on behalf of the lender, pursuant to a deed of trust, to secure

19 repayment of the loan.  *Id.* ¶ 6.  When the underlying loan is repaid in full, the trustee

20 executes a deed of trust transferring title back to the borrower.  *Id.*  This deed of trust is

21 recorded in public land records.  *Id.*  The entire process is called "reconveyance."  *Id.*  In

22 some cases, trustees charge a fee to prepare and process a deed of trust (a "trustee fee"),

23 and county recording offices generally charge fees to record a reconveyance (a "county

24 recording fee").  *Id.*

25     During the years leading up to 2008, escrow companies that facilitated real estate

26 closings generally collected $100 to $150 from borrowers, at the time of closing of the

27 transaction in which they were selling or refinancing a property, to ensure that the escrow

28 companies held sufficient funds to cover costs that might be associated with

GOVERNMENT'S MOTION FOR INQUIRY CONCERNING POTENTIAL
CONFLICTS OF INTEREST/KELLEY (No. CR15-5198RBL) - 2

1   reconveyance, including trustee fees and county recording fees. *Id.* ¶ 8.  Kelley

2   represented to escrow companies that Post Closing Department would take custody of the

3   entire fee paid by borrowers, that it would track reconveyances for the escrow companies

4   for a flat fee of $15 or 20 per reconveyance (the amount varied depending upon the

5   escrow company), that Post Closing Department would pay any necessary trustee fees

6   and county recording fees, and that it would refund any unused moneys to borrowers. *Id.*

7   ¶¶ 14-15, 32-34.

8           In fact, major lenders processed the vast majority of reconveyances that Post

9   Closing Department tracked.  *Id.* ¶¶ 18, 28.  As a result, Post Closing Department

10  generally did not need to pay any trustee fees or county recording fees to effect the vast

11  majority of reconveyances. *Id.* ¶ 18.  Instead of returning unused reconveyance fees to

12  borrowers, however, Kelley and Post Closing Department kept the money, all the while

13  continuing falsely to represent that Post Closing Department was charging a flat fee of

14  only $15 or $20 per reconveyance for its work.  *Id.* ¶¶ 20-24, 39-41.

15          Because Kelley was not refunding to borrowers unused fees that he should have

16  refunded, Kelley accumulated large balances in the bank accounts that held the money.

17  *Id.* ¶¶ 30, 46.  In the years leading up to and including 2008, Kelley neither declared this

18  money as income on United National's tax returns, nor reported it on his own personal

19  tax returns, to which the income from United National's tax returns ultimately flowed.

20  *Id.* ¶¶ 47-54.

21          After class actions lawsuits were filed against escrow companies seeking the

22  return of unused reconveyance fees, Kelley rapidly transferred the money he had failed to

23  refund through a series of bank accounts in different names.  *Id.* ¶¶ 61-66.  Thus, within

24  less than a month, Kelley transferred more than $3.6 million (at least $1.4 million of it

25  money Kelley had failed to refund):

26              (1)  to a newly-opened account at Wells Fargo bank in the
                     name of United National,
27

28

GOVERNMENT'S MOTION FOR INQUIRY CONCERNING POTENTIAL
CONFLICTS OF INTEREST/KELLEY (No. CR15-5198RBL) - 3

(2)  to a newly-opened account at U.S. Bank in the name of United National,

(3)  to a newly-opened account at Nevada State Bank in the name of Blackstone International, Inc. (an S Corporation owned by Kelley that held a majority interest in United National), and

(4)  finally, to a newly-opened account at Vanguard in the name of Berkeley United, LLC, itself a newly-established corporation, that was 99%-owned by Wellington Trust, also newly-established, a Belizean trust controlled by Kelley.

*Id.* ¶¶ 61-67.  Count 1 of the Indictment charges Kelley with possession of stolen property, namely stolen money in the Berkeley United account at Vanguard.

**B.    Kelley's Statements About/Treatment of the Stolen Money**

Over the years, Kelley made inconsistent statements about the stolen money, and treated the money inconsistently, in ways relevant to the charges pending against him and to the potential conflicts of interest raised in this motion.  For example, in communications with an accountant, and in a document on the letterhead of a business named Attorney Trustee Services (ATS), Kelley suggested that United National's files had been transferred to ATS, which would continue to perform work on existing reconveyances and would earn income as it performed the work.

When he was deposed in 2010 in a civil suit brought against him by Old Republic seeking the return of reconveyance fees that should have been refunded to borrowers, however, Kelley claimed that he had not stolen the money.  Kelley stated that he was entitled to charge additional fees beyond his flat fee, that he had performed a reconciliation after shutting down his business, and that he had determined that all of the money transferred to the Berkeley United account represented "fees earned" for "services provided."  *Id.* ¶¶ 80-81.  Notwithstanding that statement, in May 2011, Kelley settled the lawsuit and repaid Old Republic $1,050,000 million drawn from the money in the Berkeley United account at Vanguard.  *Id.*

GOVERNMENT'S MOTION FOR INQUIRY CONCERNING POTENTIAL
CONFLICTS OF INTEREST/KELLEY (No. CR15-5198RBL) - 4

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   Despite his claim in his deposition that he had earned all of the money transferred
2   to Vanguard, Kelley admitted that he had not paid income tax on the money. *Id.* ¶ 81.
3   Kelley attempted to explain this by saying that, although he had "earned" the money, the
4   income had not yet been "realized." *Id.* Following the settlement with Old Republic,
5   beginning in 2011, Kelley began withdrawing $245,000 annually from the remaining
6   money that he had transferred to Vanguard. *Id.* ¶ 83-84, 88. 94.  Kelley transferred this
7   to accounts in the name of Blackstone International and reported the $245,000 as income
8   on income tax returns that he filed for Blackstone International (but offset a substantial
9   portion of the income by claiming fraudulent business deductions). *Id.* ¶¶ 83-85, 91.
10  Kelley reported on the income tax returns that the $245,000 withdrawals came from an
11  "impound account." *Id.* ¶ 95.

12   And, finally, in April 2013, Kelley was interviewed by IRS Special Agents. *Id.* ¶
13  92.  Notwithstanding his prior testimony in his deposition that he had earned the money,
14  Kelley explained his failure to declare the money as income on his 2006-2008 tax returns,
15  and his reporting of $245,000 of income annually beginning in 2011, to the IRS Special
16  Agents by once again claiming that Kelley's company was continuing to earn income by
17  continuing to perform work on old reconveyance files. *Id.*

18  **C.    Kelley's Legal Representation**

19   Following his April 2013 interview by IRS Special Agents, Kelley retained Robert
20  McCallum and the law firm of LeSourd & Patten, P.S., to represent him in connection
21  with the Government's investigation.  The Government understands that Kelley's wife,
22  who owned a company that was a part owner of United National but who had little
23  substantive involvement in the business, initially retained Mark Bartlett and the law firm
24  of Davis Wright Tremaine LLP to represent her in connection with the investigation.  By
25  no later than 2014, Mr. Bartlett apparently had ceased to represent Kelley's wife, and
26  Kelley had retained Mr. Bartlett to represent him.

27   Since 2014, Mr. McCallum and Mr. Bartlett have jointly represented Kelley in
28  dealings with the Government.  After Kelley was charged in this case, both Mr.

GOVERNMENT'S MOTION FOR INQUIRY CONCERNING POTENTIAL
CONFLICTS OF INTEREST/KELLEY (No. CR15-5198RBL) - 5

McCallum and Mr. Bartlett entered conditional appearances on behalf of Kelley at Kelley's initial appearance.  Docket No. 7.  Mr. Bartlett subsequently entered a formal appearance in the case.  Docket No. 11.  Mr. McCallum filed a notice of non-representation.  Docket No. 12.  Mr. McCallum has indicated to the Government that he continues to represent Kelley along with Mr. Bartlett, and that he may, at some point in the future, file an actual appearance, and appear, in this case.

Because Mr. McCallum has not entered an actual appearance, this Motion for Inquiry focuses on actual or potential conflicts that could affect Mr. Bartlett's representation.  In the event that Mr. McCallum enters an appearance, the Government would have additional concerns concerning potential conflicts that could affect Mr. McCallum's representation of Kelley, and likely would seek an inquiry concerning those conflicts of interest.

**D.    The Potential Conflicts of Interest**

The potential conflicts at issue relate primarily to actions Kelley took after retaining Mr. McCallum and/or Mr. Bartlett.  Kelley continued to withdraw $245,000 annually, each year through 2015, from the money that he had transferred to Vanguard.  *Id.* ¶ 92.  And, on February 7, 2014, Kelley filed a tax return for the year 2013 for Blackstone International.  On that return, as he had done in the preceeding two years, Kelley reported that Blackstone had earned $245,000 of income during the year 2013.

By March 2015, the remaining amount in the pot of money at Vanguard (which Kelley had transferred in 2012 from the Berkeley United account at Vanguard, to an account in the name of Blackstone International at Vanguard, and from which he had, by 2015, made five $245,000 withdrawals) had been reduced to $1,355,843.  *Id.* ¶ 94.  On March 26, 2015, after defense counsel had been told that Kelley was likely to be indicted on April 15, 2015, Kelley wrote two checks on this account, which reduced the balance in the account to zero.  *Id.* ¶ 95.

Thus, Kelley wrote a check to the United States Treasury for $447,421.  On the memo line of that check, Kelley wrote "Form 1040 2016-2020."  Kelley submitted this

GOVERNMENT'S MOTION FOR INQUIRY CONCERNING POTENTIAL
CONFLICTS OF INTEREST/KELLEY (No. CR15-5198RBL) - 6

check to the IRS under cover of a letter written by Mr. McCallum that stated that the payment related to "a disputable item of income tax" and asked that it be "designated as a payment of tax for [Kelley's] 2016 through 2020 Form 1040 income taxes." In addition, Kelley wrote a check for the remaining $908,397 in the Vanguard account, payable to the trust account of the law firm of Davis Wright Tremaine. Mr. Bartlett since has communicated to Government counsel that this amount represented "retainers."

These payments represent Kelley's conversion to his personal benefit of money that Kelley previously had represented to the IRS on his tax returns was being held in an impound account (presumably for the benefit of third party escrow companies or borrowers). It also is money that Kelley told IRS Special Agents in April 2013 he had not yet earned, and for which his company still was performing work. As a result, Kelley's contradictory treatment of this money is important evidence that the Government will seek to introduce at Kelley's trial.

The government does not know to what extent these payments may have been made based upon advice from counsel and, in particular, Mr. Bartlett, Mr. McCallum, or other lawyers at either of their law firms. To the extent that the payments were based on such advice, and particularly upon advice from Mr. Bartlett or a lawyer at the law firm of Davis Wright Tremaine (or that Kelley believes that the payments were made in reliance upon such advice, since Mr. Bartlett and the law firm presumably were aware of the source of the money), Kelley would have a possible advice-of-counsel defense and Mr. Bartlett would face a conflict of interest in representing Kelley in this case for the reasons discussed in Part III below.

GOVERNMENT'S MOTION FOR INQUIRY CONCERNING POTENTIAL
CONFLICTS OF INTEREST/KELLEY (No. CR15-5198RBL) - 7

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

# III.  ARGUMENT

**A.    Legal Framework**

It is well established that a criminal defendant has a constitutional right to the effective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984). Effective assistance of counsel means representation that is untrammeled and unimpaired, *Glasser v. United States*, 315 U.S. 60, 70 (1942), and requires representation by an attorney with undivided loyalty and free from conflicts of interest.  *Strickland*, 466 U.S. at 688, *United States v. Partin*, 601 F.2d 1000, 1006 (9th Cir. 1979).

Because of the importance of effective assistance of counsel, defendants do not have an absolute right to counsel of choice.  Courts have "an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them."  *United States v. Wheat*, 486 U.S. 153, 160 (1988).  Thus, there is "a presumption in favor of [] counsel of choice, but that presumption may be overcome not only by a demonstration of an actual conflict but by a showing of a serious potential for conflict."  *Id.* at 164.

Moreover, as *Wheat* noted,

> Unfortunately for all concerned, a district court must pass on the issue whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pretrial context when relationships between parties are seen through a glass, darkly.  The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those familiar with criminal trials. . . .

> For these reasons . . . the district court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   *Id.* at 163.

2   Among the situations that may require disqualification of an attorney are cases in

3   which an attorney has provided legal advice to a defendant, so that the defendant has a

4   potential advice-of-counsel defense.  For example, in *United States v. Evanson*, 584 F.3d

5   904 (10th Cir. 2009), a defendant charged with a variety of tax-fraud related offenses,

6   based upon his operation of a business that assisted clients in committing tax fraud, sent

7   letters to two clients as the scheme was unravelling, which the government considered

8   evidence of a cover-up.  The defendant sought to be represented in his criminal case by a

9   lawyer who apparently had reviewed one letter and who supposedly had suggested the

10  defendant contact the other client.

11  The district court disqualified the attorney, and the Tenth Circuit affirmed.  The

12  Tenth Circuit noted that the possible advice-of-counsel defense relating to this evidence

13  presented multiple issues.  First, it could implicate the lawyer in allegedly unlawful acts.

14  In that case, a conflict would arise if the attorney were constrained from making certain

15  arguments, or tempted to minimize his own conduct at the expense of the defendant.  *Id.*

16  at 913.  Second, even if the defendant waived such a defense, the defendant later could

17  challenge his conviction claiming that his lawyer had rejected the defense based on his

18  own self-interest.  *Id.* at 913-14.

19  And, alternately, if the defendant sought to pursue an advice-of-counsel defense,

20  the lawyer's representation would engender other problems at trial, because the lawyer

21  "could become an unsworn witness who 'subtly imparte[ed] to the jury his first-hand

22  knowledge" . . . ,  thereby giving his client an unfair advantage.  *Id.* at 914 (*quoting*

23  *United States v. Locascio,* 6 F.3d 924 (2d Cir. 1993)).  In addition, presentation of the

24  defense would waive any privilege, and would expose the lawyer to being called by the

25  government and having to provide testimony against his own client.  *Id.*  Given these

26  facts, the Tenth Circuit held that the district court did not exceed the "broad latitude" to

27  which it was entitled when it disqualified the lawyer.  *Id.*

28

GOVERNMENT'S MOTION FOR INQUIRY CONCERNING POTENTIAL
CONFLICTS OF INTEREST/KELLEY (No. CR15-5198RBL) - 9

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   Similarly, in *United States v. Swafford,* 512 F.3d 833 (6th Cir. 2007), a defendant

2   charged with possession and sale of iodine with the intent or reasonable cause to believe

3   it would be used to manufacture methamphetamine sought to be represented by a lawyer

4   at a law firm with which he allegedly had consulted about his actions.  The district court

5   disqualified the lawyer, finding that he could not represent the defendant consistently

6   with the Tennessee Rules of Professional Conduct, and also that the Government had

7   demonstrated "a serious potential for conflict," needed to disqualify a lawyer over a

8   defendant's objection under *Wheat.   United States v. Swafford,* 2005 U.S. Dist. LEXIS

9   26890 (E.D. Tenn. 2005).  The Sixth Circuit affirmed the disqualification, noting that the

10   district court appropriately had explained the conflicts that it believed might arise during

11   trial, notwithstanding the defendant's waiver of an advice-of-counsel defense.  *Swafford*,

12   512 F.3d at 841.

13   As suggested by *Swafford*, one factor that courts consider in determining whether

14   an attorney may represent a defendant is the need to ensure that any such representation

15   would be consistent with applicable rules of professional conduct.  Rule 83.3(a)(2) of the

16   local Civil Rules of this Court, which is made applicable to criminal cases by Rule 1 of

17   the local Criminal Rules, provides that the Washington Rules of Professional Conduct

18   apply to practice in this Court.  Local Rules for the Western District of Washington

19   LCR 83.3(a)(2), CrR 1.  Rule 3.7(a) of the Washington Rules of Professional conduct

20   provides that "[a] lawyer shall not act as advocate at a trial in which the lawyer is likely

21   to be a necessary witness unless:  (1) the testimony relates to an uncontested issue; . . . or

22   (4) the lawyer has been called by the opposing party and the court rules that the lawyer

23   may continue to act as an advocate."  Washington Rule of Professional Conduct 3.7(a).

24   Significantly, though, even if representation is permissible under the applicable

25   rules of professional conduct, disqualification of an attorney may be warranted.  As the

26   *Evanson* court noted, "Rule 3.7 cannot supplant constitutional standards.  Even if a

27   specific conflict of interest is addressed by a rule of professional conduct, such a rule

28   cannot define the scope of a defendant's Sixth Amendment rights.  True, rules of

GOVERNMENT'S MOTION FOR INQUIRY CONCERNING POTENTIAL
CONFLICTS OF INTEREST/KELLEY (No. CR15-5198RBL) - 10

professional conduct are relevant in the sense that a court's authority to disqualify counsel stems in part from its interest in ensuring that criminal trials are conducted within the ethical standards of the profession.  But it does not follow that the Sixth Amendment requires courts to identify a strict violation of an applicable ethical rule before disqualifying counsel." *Evanson*, 584 F.3d at 910 (internal quotations and citations omitted).

**B.    Kelley's Case**

**1.    The March 26, 2015, Payments from the Vanguard Account**

The two payments from the Blackstone International account on March 26, 2015 – namely the $447,421 payment to the United States Government and the $908,397 payment to the trust account of Davis Wright Tremaine –  present multiple potential conflicts of interest that are relevant to Mr. Bartlett's ability to represent Kelley.

Kelley is charged in Count 1 with possession of stolen property based upon his possession of money that Kelley transferred to the Berkeley United account at Vanguard, and that was the source of the money remaining in the Blackstone International account on March 26, 2015.  Kelley is charged in Counts 8 and 9 with failing to declare some of that money as income in 2008.  And Kelley is charged in Count 10 with false statements based upon his statement to IRS Special Agents that he had not yet earned the money in the Vanguard accounts but was earning it by continuing to perform work.

The payments to Davis Wright Tremaine and to the United States Government constitute evidence that – contrary to his statements in tax returns and to IRS Special Agents – Kelley in fact possessed and controlled the money in the Vanguard account, rather than holding it in impound for the benefit of third parties.  If Kelley in fact believed that the money appropriately should be held in an impound account (as he represented on tax returns) because he had not yet earned it (as he represented to IRS

GOVERNMENT'S MOTION FOR INQUIRY CONCERNING POTENTIAL
CONFLICTS OF INTEREST/KELLEY (No. CR15-5198RBL) - 11

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Special Agents), Kelley could not plausibly have decided in March 2015, that he was

2  entitled simply to convert the money to his own benefit.[1]

3  As a result, the March 26, 2015, transactions – and the change in Kelley's

4  treatment of, and claims about, the money in the Vanguard accounts that they reflect –

5  constitute evidence that Kelley stole the money, and therefore also evidence of the crimes

6  with which Kelley is charged in Counts 1, 8, 9, and 10.  And they are evidence that the

7  Government will certainly seek to introduce at trial.

8  To the extent that Kelley made these payments in reliance upon advice from Mr.

9  Bartlett, or from any other attorney at Davis Wright Tremaine (or that Kelley believed

10  that any such attorney approved the payments – which, at a minimum, appears likely

11  since Davis Wright Tremaine was the recipient of one of the payments), Kelley would

12  have a possible advice-of-counsel defense.  The availability of such a defense would raise

13  many of the concerns considered in *Evanson* and *Swafford*.  Those concerns would

14  include concerns regarding Mr. Bartlett's potential personal interest in minimizing his or

15  his law firm's involvement which would undercut any advice-of-counsel defense, the fact

16  that Mr. Bartlett might be placed in a position in which he was both an advocate and an

17  unsworn witness, and the possibility that Mr. Bartlett might be required to cross examine

18  other lawyers at his firm or might himself be subject to being called as a witness and

19  examined concerning his advice to his client.

20  Even if the payments were not made in reliance upon advice from Mr. Bartlett or

21  another attorney at Davis Wright Tremaine, if they were made in reliance upon advice

22  from Mr. McCallum (which appears likely in the case of at least the payment to the

23  United States Treasury, since that payment was made under cover of a letter written by

24  Mr. McCallum), Mr. Bartlett would face potential conflicts of interest that would

25  implicate some of the issues discussed in *Evanson* and *Swafford*.  Specifically, because

26

27  [1]  Although a taxpayer using accrual-basis accounting – as Blackstone International purported to do -- may spend revenue that it receives before it actually earns the income by performing the services for which the revenue was

28  received, that is not the case here.  The evidence at trial will establish that Kelley was not in fact continuing to perform services or to earn the revenue.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   Mr. Bartlett and Mr. McCallum have jointly represented Kelley for a substantial period,

2   and continue to do so, Mr. Bartlett might well have been present and involved when any

3   advice was given, and might be perceived by the jury as an unsworn witness.

4        Finally, regardless of whether Kelley has a possible advice-of-counsel defense, the

5   Government believes that it will be required to call some witness from Davis Wright

6   Tremaine to testify that the money transferred to the firm was transferred to be used for

7   Kelley's benefit, rather than simply being held in trust or impound for the benefit of

8   escrow companies or borrowers.  The fact that the Government would need to call a

9   witness from Davis Wright Tremaine again raises concerns considered in *Evanson* and

10  *Swafford*, since Mr. Bartlett either could be that witness or could be required to cross

11  examine a representative from his own firm, and since the mere fact of a Davis Wright

12  Tremaine employee testifying would implicate the concerns about Mr. Bartlett and his

13  firm serving as both advocate and witness.

14       For these reasons, the Government believes that the Court should inquire into

15  whether Mr. Bartlett, Mr. McCallum, or any other lawyer at either of their firms provided

16  Kelley advice relating to his decision to pay $908,397 from the Blackstone International

17  account at Vanguard to the Davis Wright Tremaine trust account as a retainer, and

18  $447,421 from that account to the United States Government as a supposed advance

19  payment of taxes.  The Court also should inquire whether Kelley believed that he

20  received any such advice, expressly or implicitly.  In the event that the Court determines

21  that any such lawyer provided such advice, or that Kelley believes he received such

22  advice, the Court should determine whether Kelley intends to pursue an advice-of-

23  counsel defense or is willing to waive such a defense, and also whether Kelley is willing

24  to waive any conflict.

25       Finally, the Court should permit the parties an opportunity to brief the impact that

26  the facts developed by its inquiry have on defense counsel's ability to continue to

27  represent Kelley.  The Court should permit such additional briefing, because the impact

28  of the conflict necessarily will depend upon facts yet to be developed, including the

GOVERNMENT'S MOTION FOR INQUIRY CONCERNING POTENTIAL
CONFLICTS OF INTEREST/KELLEY (No. CR15-5198RBL) - 13

1  nature of any advice, which attorney gave any advice at issue, and Kelley's willingness to

2  waive any conflict.

3         **2.**      **Other Potential Conflicts of Interest**

4         In addition to inquiring into the facts relating to the $908,397 payment, the Court

5  should inquire into two other areas that also might give rise to conflicts of interest, and

6  into Kelley's willingness to waive any such conflicts.

7         First, the Court should inquire into whether Mr. Bartlett or any other attorney at

8  Davis Wright Tremaine provided Mr. Kelley any advice relating to any of the

9  withdrawals of $245,000 in 2013, 2014, or 2015, or to Mr. Kelley's declaration of that

10  amount as income on Blackstone's 2013 tax return.  These actions are a continuation of

11  Kelley's conduct in failing to declare as income money that he stole in 2006 through

12  2008, and in falsely representing to IRS Special Agents in 2013 that he was drawing

13  down the money at Vanguard beginning in 2011 for supposed ongoing work on

14  reconveyances.

15         As a result, in the event that either Mr. Bartlett or another attorney at Davis Wright

16  Tremaine gave any such advice, Kelley arguably could assert an advice-of-counsel

17  defense.  As a result, Mr. Bartlett could be placed in a position in which he was both an

18  advocate and a witness, or was an unsworn witness.  Therefore, the Court should inquire

19  into whether Mr. Bartlett or any other attorney at Davis Wright Tremaine provided any

20  advice concerning these subjects, whether Kelley intends to pursue an advice-of-counsel

21  defense incorporating any such advice, whether he is willing to waive such a defense, and

22  whether he is willing to waive any conflict.

23         Second, the Court should inquire into any possible conflicts stemming from Mr.

24  Bartlett's prior representation of Kelley's wife.  Although the Government is not aware of

25  any specific conflict that is likely to arise from that representation, the fact that a

26  defendant's lawyer previously has represented a witness may give rise to issues where the

27  lawyer's ethical obligations to the witness limit the lawyer's ability to represent a

28  defendant (for example, by limiting the lawyer's ability to use information obtained from

GOVERNMENT'S MOTION FOR INQUIRY CONCERNING POTENTIAL
CONFLICTS OF INTEREST/KELLEY (No. CR15-5198RBL) - 14

the witness, or to cross-examine the witness).  *See generally* Washington Rules of Professional Conduct 1.6(a) (providing that a lawyer "shall not reveal information relating to the representation of a client unless the client gives informed consent"); 1.9(a), (c) (providing that a lawyer "who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing" and "shall not [] use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require").

As a result, the Court should inquire concerning the scope of Mr. Bartlett's prior representation of Kelley's wife.  The Court also should inquire of Mr. Bartlett and of Kelley regarding any possible conflict that they believe might arise from that representation.  Finally, the Court should inquire as to Kelley's and his wife's willingness to waive any potential conflict of interest.

## IV.  CONCLUSION

For the foregoing reasons, the Court should conduct an inquiry into Kelley's counsel's potential conflicts of interest relating to Kelley's recent payments of $908,397 to Davis Wright Tremaine and $447,421 to the United States Treasury.  The Court also should inquire into the others issues set forth in Part III.B.2.  Based upon the results

GOVERNMENT'S MOTION FOR INQUIRY CONCERNING POTENTIAL
CONFLICTS OF INTEREST/KELLEY (No. CR15-5198RBL) - 15

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  of those inquiries, the Court then should permit the parties the opportunity to brief the

2  impact of any conflicts on defense counsel's ability to continue to represent Kelley.

3        DATED:  this 26th day of May, 2015.

4

5                              Respectfully submitted,

6                              ANNETTE L. HAYES
                               United States Attorney
7

8                              s/ Andrew C. Friedman
                               ANDREW C. FRIEDMAN
9                              Assistant United States Attorney

10

11                             s/ Katheryn Kim Frierson
                               KATHERYN KIM FRIERSON
12                             Assistant United States Attorney

13

14                             s/ Arlen R. Storm
                               ARLEN R. STORM
15                             Assistant United States Attorney

16                             700 Stewart Street, Suite 5220
                               Seattle, Washington  98101-1271
17                             Telephone:   (206) 553-2277
                               Fax:          (206) 553-0755
18
                               E-mail:      Andrew.Friedman@usdoj.gov
19                                          Katheryn.K.Frierson@usdoj.gov
20                                          Arlen.Storm@usdoj.gov

21

22

23

24

25

26

27

28

GOVERNMENT'S MOTION FOR INQUIRY CONCERNING POTENTIAL
CONFLICTS OF INTEREST/KELLEY (No. CR15-5198RBL) - 16

1

## CERTIFICATE OF SERVICE

2

3          I hereby certify that on May 26, 2015, I electronically filed the foregoing with the

4   Clerk of Court using the CM/ECF system which will send notification of such filing to

5   the attorney(s) of record for the defendant(s).  I hereby certify that I have served the

6   attorney(s) of record for the defendant(s) that are non CM/ECF participants via e-mail

7   and/or telefax.

8

9                              *s/ Lissette Duran-Leutz*
                              Lissette Duran-Leutz
10                             Paralegal Specialist
                              United States Attorney's Office
11                             Western District of Washington
                              700 Stewart Street, Suite 5220
12                             Seattle, Washington 98101-1271
                              Telephone:    (206) 553-7234
13                             Fax:            (206) 553-2502
                              E-mail:  Lissette.I.Duran-Leutz@usdoj.gov
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GOVERNMENT'S MOTION FOR INQUIRY CONCERNING POTENTIAL
CONFLICTS OF INTEREST/KELLEY (No. CR15-5198RBL) - 17

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970