Judge Ronald B. Leighton

Presented to the Court by the foreman of the
Grand Jury in open Court, in the presence of
the Grand Jury and FILED in the U.S.
DISTRICT COURT at Seattle, Washington.

SEPTEMBER 3, 20 15

WILLIAM M. McCOOL, Clerk

By_____ Deputy

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                   Plaintiff,<br><br>                v.<br><br>TROY X. KELLEY,<br><br>                   Defendant. | No. CR15-5198RBL<br><br>**SUPERSEDING INDICTMENT** |

THE GRAND JURY CHARGES THAT:

## INTRODUCTION

**I.**    **Background**

    *A.*    ***The Defendant and Relevant Entities***

      1.    TROY X. KELLEY, a resident of Tacoma, Washington, holds a J.D. and an

M.B.A., and is an attorney licensed to practice law in the States of California, New York,

and Washington, and in the District of Columbia. TROY X. KELLEY's experience

includes work as counsel, and then general counsel, for a real estate title company in

California, as president of a division of that company, and as a small business owner and

operator whose business served the title industry.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1       2.     Blackstone International, Inc. ("Blackstone"), is an S Corporation formed

2  in the State of Nevada on or about October 26, 2000.  Since Blackstone's inception,

3  TROY X. KELLEY has been Blackstone's President and sole owner.

4       3.     Attorney Trustee Services, Inc. ("ATS"), is an S Corporation.  Originally,

5  TROY X. KELLEY's wife, D.D.K., was the President of ATS.  Subsequently, TROY X.

6  KELLEY became the President of ATS.  Through at least 2008, D.D.K. was the sole

7  owner of ATS.

8       4.     United National, LLC ("United National"), was a limited liability company

9  incorporated in Washington State on or about August 2, 2002.  TROY X. KELLEY was

10  United National's President.  Originally, Blackstone owned 50% of United National.  By

11  2008, Blackstone owned 79.3% of United National, ATS owned 18.1% of the company,

12  and a minority partner owned 2.6% of the company.  United National operated under the

13  name Post Closing Department (also known as "PCD") and provided reconveyance-

14  tracking services to real estate escrow companies.  On August 11, 2008, TROY X.

15  KELLEY cancelled United National's registration in Washington State.

16       5.     Fidelity National Title of Washington ("Fidelity") and Old Republic Title

17  ("Old Republic") were escrow companies that offered real estate settlement services in

18  Washington State.  United National d/b/a Post Closing Department, provided

19  reconveyance-tracking services to these escrow companies and others.

20     **B.**    ***The Reconveyance-Processing Industry***

21       6.     Generally, individuals who borrow money to purchase or refinance a home

22  ("borrowers") are required to grant a deed of trust to a trustee.  The trustee holds title to

23  the property on behalf of the lender, pursuant to that deed of trust, to secure repayment of

24  the loan.  When an underlying loan is paid in full, such as through the sale of the property

25  or through a refinancing, the lender sends the trustee proof of repayment, after which the

26  trustee transfers title back to the original borrower.  The process of transferring title back

27  to the borrower is called "reconveyance."  The reconveyance process is completed when

28  a deed of reconveyance is executed by the trustee and recorded in the recorder's office of

1   the county where the property is located.  Trustees may charge a fee to process a

2   reconveyance (a "trustee fee"), and county recording offices generally charge a fee to

3   record a reconveyance (a "county recording fee").

4          7.     Escrow companies performing real estate settlement services collect and

5   disburse loan funds and sales proceeds, and facilitate documentation of real estate

6   transactions, all in accordance with the escrow instructions of the parties to a real estate

7   transaction.  As part of their service, escrow companies also facilitate the reconveyance

8   process by collecting from borrowers fees in amounts sufficient to cover the potential

9   costs associated with the reconveyance process.

10          8.     The potential costs associated with the reconveyance process include the

11   cost of paying trustee fees and county recording fees (collectively, "reconveyance-

12   processing fees"), as well as the cost of tracking reconveyances to ensure that they are

13   completed ("reconveyance tracking").  During the period relevant to this Superseding

14   Indictment, escrow companies typically collected between $100 and $150 per

15   reconveyance (a "reconveyance fee") from borrowers to cover reconveyance-processing

16   fees and reconveyance-tracking costs.

17          9.     In many cases, lenders processed reconveyances themselves, either for a

18   minimal fee charged directly to the borrower as part of the borrower's loan payoff, or for

19   no fee.  When lenders processed reconveyances, escrow companies did not need to pay

20   reconveyance-processing costs, such as trustee fees or county recording fees.

21          10.    Rather than administer reconveyance fees and track reconveyances

22   themselves, in some cases, escrow companies contracted with outside vendors that

23   administered reconveyance fees and performed reconveyance-tracking services.  Post

24   Closing Department was a vendor utilized by escrow companies to administer

25   reconveyance fees, and track reconveyances, for the benefit of escrow parties.

26  **II.**     **Summary of Charges**

27          11.    Between about 2003 and about June 2008, TROY X. KELLEY, through

28   Post Closing Department, provided reconveyance-tracking services to Fidelity and Old

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 3

1    Republic.  TROY X. KELLEY represented to Fidelity and Old Republic that, in return
2    for a flat fee per reconveyance, Post Closing Department would receive and administer
3    the full amount of reconveyance fees collected by the escrow companies from borrowers
4    and (1) track the filing of reconveyances; (2) pay any necessary reconveyance-processing
5    fees, such as trustee fees and county recording fees; and (3) refund the unused portions of
6    the reconveyance fees back to the borrowers.  In reliance upon TROY X. KELLEY's
7    representations, Fidelity and Old Republic entrusted TROY X. KELLEY and Post
8    Closing Department with millions of dollars of reconveyance fees.  In truth and in fact,
9    TROY X. KELLEY lied to Fidelity and Old Republic and did not administer the
10   reconveyance fees as promised.  Contrary to his representations, TROY X. KELLEY did
11   not refund unused portions of reconveyance fees to borrowers, but instead fraudulently
12   retained, stole, and converted them to his own use.  Based upon this conduct, Count 1 of
13   this Superseding Indictment charges TROY X. KELLEY with Possession and
14   Concealment of Stolen Property, namely, approximately $1,463,171 of unused
15   reconveyance-processing fees that should have been refunded to borrowers, as well as
16   more than $5,000, of reconveyance-tracking fees that should have been refunded to
17   escrow companies or borrowers for transactions that were not complete when TROY X.
18   KELLEY closed Post Closing Department.
19           12.    In May 2008, class action lawsuits were filed on behalf of borrowers
20   against Fidelity and Old Republic, seeking, among other things, the return of
21   reconveyance fees charged by the escrow companies for services that were in fact
22   performed by lenders.  In June 2008, anticipating that borrowers and escrow companies
23   might seek the return of such fees from Post Closing Department, TROY X. KELLEY,
24   attempted to conceal the funds by moving them rapidly between numerous bank
25   accounts, and eventually depositing the funds into an account in the name of a newly-
26   created shell entity controlled by TROY X. KELLEY.  TROY X. KELLEY also
27   attempted to divert attention from himself, and to discredit and disqualify one of the
28   named plaintiffs in the civil suits, by issuing a refund check to him.  In about December

1  2009, Old Republic sued TROY X. KELLEY, seeking the return of unused reconveyance

2  fees. In the course of the litigation with Old Republic, TROY X. KELLEY gave false

3  testimony during a deposition, and lied in sworn declarations submitted to the Court.

4  Based upon this conduct, Counts 2- 5 of this Superseding Indictment charge TROY X.

5  KELLEY with False Declarations.

6         13.    Beginning in 2011, after all of the litigation against him had been resolved,

7  TROY X. KELLEY sought ways to spend for his own benefit the unlawfully-retained

8  reconveyance fees, while concealing and disguising the nature and source of his assets.

9  As an elected official, and later, as a candidate for state-wide office, TROY X. KELLEY

10  well knew that the sources of his income and assets would continue to be subject to

11  reporting requirement and likely would be subject to additional scrutiny. Therefore,

12  starting in 2011 and continuing through 2015, TROY X. KELLEY withdrew $245,000

13  annually from the pool containing his illicit proceeds, and, rather than pay himself

14  directly, funneled the money through an account held in the name of his long-existing S

15  Corporation, Blackstone. As a result, TROY X. KELLEY made it appear that a company

16  he long had owned earned annually some form of legitimate income, while concealing

17  and disguising and attempting to conceal and disguise the fact that TROY X. KELLEY

18  was simply drawing down the accumulated proceeds he had unlawfully taken through his

19  prior business, Post Closing Department. Based upon this conduct, Counts 6-10 of this

20  Superseding Indictment charge TROY X. KELLEY with Money Laundering.

21         14.    Finally, TROY X. KELLEY engaged in a long-running scheme to avoid

22  and reduce his taxes on the unlawfully-retained reconveyance fees. For the tax years

23  between 2006 and 2008, TROY X. KELLEY fraudulently underreported United

24  National's and his own gross receipts and income, and avoided declaring and paying

25  taxes on the reconveyance fees that he had unlawfully retained. Beginning in 2011, after

26  all of the litigation against him had been resolved, TROY X. KELLEY began

27  withdrawing $245,000 annually from the pool of unlawfully-retained reconveyance fees.

28  TROY X. KELLEY reported the $245,000 that he drew down annually as income to his

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 5

1  wholly-owned S Corporation, Blackstone.  For the 2011 and 2012 tax years, however,

2  TROY X. KELLEY sought to reduce his tax by fraudulently claiming as business

3  deductions, on Blackstone's return, personal and campaign-related expenditures that were

4  not legitimate business expenses.  Finally, when Internal Revenue Service (IRS) agents

5  interviewed TROY X. KELLEY in April 2013, TROY X. KELLEY falsely stated he

6  reported $245,000 of income in each of 2011 and 2012, because he was continuing to

7  perform reconveyance-tracking services and was only reporting income as he earned it.

8  Based upon this conduct, Counts 11-17 of this Superseding Indictment charge TROY X.

9  KELLEY with Corrupt Interference with Internal Revenue Laws, with Filing False

10  Income Tax Returns, and with False Statements to IRS Agents.

11  **III.    The Reconveyance-Fee Fraud Scheme**

12         *A.    The Fraud Relating to Fidelity*

13         15.    During 2003, TROY X. KELLEY entered into a business agreement with

14  Fidelity.  Both orally and in writing, TROY X. KELLEY represented that, for a flat fee of

15  $15 per file, Post Closing Department would (1) provide Fidelity reconveyance-tracking

16  services for real estate transactions in King and Snohomish Counties; (b) receive from

17  Fidelity the full amount of reconveyance fees entrusted to Fidelity by borrowers; and,

18  (c) where Post Closing Department was not required to use the full amount of those fees

19  to pay trustee fees and/or county recording fees, or its own $15 reconveyance-tracking

20  fee, return the unused portion of reconveyance fees to borrowers.

21         16.    A written agreement, signed by Fidelity's Operations Manager on October

22  9, 2003, defined Fidelity as the "Client," and borrowers as "Customers," and provided, in

23  relevant part:

24              Fees are as follows:  $15.00 post closing tracking fee per
            item.

25                        * * *

26              Payment Terms:

27              Client shall collect post closing fee and make check payable
            to PCD (leave the check to be picked up by representative

28              and/or coordinator).  Expenses such as trustee fees and
            recording fees that are associated with a file will be advanced

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 6

and charged to that file.  At the completion of the post closing
documentation if extra funds are left over, PCD shall forward
the funds to Customer, with sample letter attached.

17.    In reliance upon TROY X. KELLEY's representations and promises,
beginning in 2003, Fidelity began using Post Closing Department to perform
reconveyance-tracking work, and caused borrowers to authorize disbursement of funds
from Fidelity to Post Closing Department for reconveyance processing and tracking.
Fidelity provided Post Closing Department files accompanied by checks made payable to
Post Closing Department in the full amount of the reconveyance fees that had been
entrusted to Fidelity for reconveyance processing and tracking by borrowers.  TROY X.
KELLEY and Post Closing Department employees subsequently cashed those checks,
depositing the funds into an account at Columbia Bank that Post Closing Department
used to hold funds received from Fidelity.  In doing so, TROY X. KELLEY and the
employees caused wire communications to be transmitted in interstate commerce in order
to effect the transactions.

18.    To track Fidelity's reconveyances, a Post Closing Department employee
entered the data for each reconveyance into a line in a large spreadsheet.  Post Closing
Department then tracked the reconveyances by logging onto county recorder's offices'
websites to check the status of the reconveyances.  When a title was reconveyed, an
employee noted the number assigned to the reconveyance in the spreadsheet.  Because
the employees understood that Post Closing Department received a flat $15 fee per
transaction tracked regardless of the amount of work involved, they did not use the
spreadsheet to record the specific tasks performed on each file.

19.    Because major lenders processed the vast majority of the reconveyances
Post Closing Department tracked, Post Closing Department generally did not need to
perform additional work, or pay additional trustee fees or county recording fees, to effect
reconveyances.  As a result, in the vast majority of cases, Post Closing Department
received from Fidelity, and retained at the completion of the reconveyances, funds

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  entrusted to Fidelity to cover possible reconveyance-processing costs that were not

2  actually needed to pay a trustee fee or a county recording fee.

3       20.     By no later than in or about January 2006, TROY X. KELLEY devised a

4  scheme and artifice to defraud Fidelity and borrowers, to obtain money from Fidelity by

5  means of false and fraudulent representations, and to steal money from Fidelity and from

6  borrowers, namely to take and convert to his own use and benefit reconveyance-

7  processing fees that TROY X. KELLEY knew should have been refunded to borrowers.

8       21.     TROY X. KELLEY decided not to pay refunds to borrowers, all the while,

9  continuing to keep up a pretense that Post Closing Department was administering fees as

10  promised, and continuing to obtain from Fidelity fees entrusted to Fidelity by borrowers.

11  Unbeknownst to Fidelity and borrowers, and contrary to his representations and

12  promises, TROY X. KELLEY directed Post Closing Department employees to issue

13  refund checks in limited circumstances, typically, when an escrow company or a

14  borrower complained that the borrower had not received a refund to which the borrower

15  was entitled.

16       22.     To conceal further from Fidelity the fact that Post Closing Department was

17  keeping unused reconveyance-processing fees, TROY X. KELLEY falsely and

18  fraudulently represented to Fidelity that Post Closing Department continued to charge

19  only a flat $15 fee per transaction tracked.

20       23.     For example, on February 16, 2006, TROY X. KELLEY sent an email to

21  an employee at Fidelity, advising that Ticor Title was raising its trustee fees to $120,

22  suggesting that Fidelity might want to do the same, and noting that PCD would hold only

23  $105 in processing fees "after our $15 fee."

24       24.     Similarly, on May 9, 2007, TROY X. KELLEY caused an employee to

25  send an email to an employee at Fidelity, stating that Post Closing Department collected

26  $15 per file, and that, in tracking each file, Post Closing Department sent letters and made

27  telephone calls.

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    25.    And on July 31, 2007, TROY X. KELLEY sent an email to an employee at

2    Fidelity, stating that he wanted "to confirm our fees are $15 per deed of trust tracked and

3    we hold what you direct us to in order that the trustee gets paid and records the

4    reconveyance." In reliance upon these false representations, Fidelity continued to cause

5    borrowers to instruct at closing that reconveyance fees entrusted to Fidelity be disbursed

6    to Post Closing Department, and Fidelity continued to disburse such fees to Post Closing

7    Department.

8    26.    In approximately March 2008, Fidelity decided to stop using Post Closing

9    Department to track reconveyances. After being notified of that fact, on March 14, 2008,

10   TROY X. KELLEY sent an employee at Fidelity an email in which he offered to

11   continue tracking Fidelity's reconveyances for a flat fee of $15 per transaction tracked,

12   while allowing Fidelity to retain the remainder of the reconveyance fees. The email

13   stated, in relevant part:

> I just wanted to let you know that there is a reconveyance
> service model that allows you to hold the income generated
> and we are paid though a monthly invoice that is $15 per file.

14
15
16

17   27.    On April 7, 2008, TROY X. KELLEY sent a similar email to another

18   employee at Fidelity, stating, in relevant part:

> I want to confirm the option that we can track new payoffs
> .... Our price is still only $15 per item and can be invoiced
> monthly.... We operate this way for six counties in Oregon
> and we even advance substantial recording fees on Fidelity's
> behalf. We do all the work after close, and Fidelity holds the
> money.

19
20
21
22

23   Despite TROY X. KELLEY's emails, Fidelity stopped using Post Closing Department in

24   March 2008.

25   28.    After Fidelity stopped using Post Closing Department to provide

26   reconveyance-tracking services, TROY X. KELLEY terminated one of the Post Closing

27   Department employees who had been primarily responsible for performing the work for

28   Fidelity. In approximately May 2008, TROY X. KELLEY picked up the Post Closing

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   Department documents remaining at the employee's residence, and caused all Post

2   Closing Department-related files to be deleted from the employee's computer.

3        29.    Because major lenders had processed the vast majority of the

4   reconveyances Post Closing Department tracked for Fidelity, Post Closing Department

5   retained a substantial amount of unused reconveyance-processing fees.  Between January

6   2006 and March 2008, Fidelity asked Post Closing Department to track approximately

7   21,158 reconveyances.  Of these, Fidelity collected reconveyance fees in an amount

8   designed to cover reconveyance-processing costs, as well as reconveyance-tracking costs,

9   in approximately 18,208 cases.

10       30.    By March 2008, the vast majority of the files tracked had reconveyed.

11  With respect to those reconveyed transactions, Post Closing Department had been

12  required to issue only approximately 460 checks to pay reconveyance-processing fees.

13  Accordingly, Post Closing Department should have refunded unused reconveyance-

14  processing fees to thousands of borrowers.  In fact, however, Post Closing Department

15  had issued only approximately 25 refund checks, totaling approximately $4,340, to

16  borrowers from the Columbia Bank account that it used to conduct Fidelity business.

17  (Post Closing Department had issued approximately 423 additional checks to pay

18  reconveyance-processing fees from bank accounts not related to specific escrow

19  companies, and had issued approximately 34 additional refund checks, totaling

20  approximately $8,837, from such accounts.  Some of those checks may have related to

21  borrowers in transactions that Post Closing Department tracked for Fidelity.)

22       31.    Instead of refunding unused reconveyance-processing fees to borrowers,

23  TROY X. KELLEY retained the vast majority of these fees in the Columbia Bank

24  account from which he conducted Fidelity business.  As a result, the balance in this

25  account, which was $745,121 on January 1, 2006, had grown to $2,361,181 by June

26  2008.  (In addition, during the same period, although Post Closing Department was

27  entitled to only approximately $317,370 for reconveyance-tracking services that it

28

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 10

1   performed for Fidelity, TROY X. KELLEY transferred approximately $443,006 from the

2   account to his own personal account at Bank of America.)

### B.    The Fraud Relating to Old Republic

3

4       32.    By no later than April 2006, TROY X. KELLEY devised a scheme and

5   artifice to defraud Old Republic and borrowers, to obtain money from Old Republic by

6   means of false and fraudulent representations, and to steal money from Old Republic and

7   borrowers.  This scheme was functionally-identical to the scheme to defraud Fidelity.

8       33.    On or about April 10, 2006, TROY X. KELLEY met with a Senior Vice

9   President of Old Republic.  TROY X. KELLEY falsely and fraudulently represented that,

10  for a flat fee of $20.00 per reconveyance, Post Closing Department would (a) provide

11  reconveyance-tracking services for real estate transactions in which Old Republic acted

12  as the escrow agent; (b) receive from Old Republic the full reconveyance fees entrusted

13  to Old Republic by borrowers; and, (c) where Post Closing Department was not required

14  to use the full reconveyance fees to pay trustee fees and county-recording fees, or its own

15  $20 reconveyance-tracking fee, it would return the unused reconveyance-processing fees

16  to borrowers.

17      34.    On or about the following day, TROY X. KELLEY sent the Old Republic

18  officer an email in which TROY X. KELLEY stated that he had created a refund letter

19  for a client who "wanted to hit the issue of the refund and integrity extra hard."  The

20  letter provided, in relevant part:

21                 To ensure that the reconveyance is done properly, Old
22                 Republic collects a Post Closing fee for each reconveyance.
                   A portion of this fee is charged to track county records for
23                 your reconveyance and the balance is charged so that Old
                   Republic or another trustee can process your reconveyance if
24                 additional [funds] are needed.  In your case, the county
25                 records show the reconveyance document has been recorded,
                   so we can close our file and we are refunding you the excess
26                 processing fee.
27

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   35. In May 2006, Old Republic and Post Closing Department signed an

2 agreement for Post Closing Department to provide reconveyance-tracking services to Old

3 Republic.  The agreement provided, in relevant part:

4     Fees are as follows:

5

6     $20.00 post closing tracking fee per item,
       fee includes management of funds due trustees &

7       client refunds
           * * *

8     Additional Terms and Conditions:

9

10       PCD shall provide client with monthly progress reports
       of reconveyance activity on each of client's files being

11       tracked as well as an accounting on all funds received
       from client that have been disbursed and/or refunded

12       to principals.

13   36. In truth and in fact, however, TROY X. KELLEY did not intend for Post

14 Closing Department to issue refund checks to the vast majority of borrowers to whom

15 refunds were owed.  Instead, TROY X. KELLEY intended to take and convert to his own

16 benefit reconveyance-processing fees that TROY X. KELLEY knew should have been

17 refunded to borrowers.

18   37. In June 2006, in reliance upon TROY X. KELLEY's representations and

19 promises, Old Republic began using Post Closing Department to provide reconveyance-

20 tracking services.  Old Republic caused borrowers to instruct at closing that

21 reconveyance fees entrusted to Old Republic be disbursed to Post Closing Department,

22 and Old Republic disbursed such fees to Post Closing Department.

23   38. Old Republic provided Post Closing Department files accompanied by

24 checks made payable to Post Closing Department in the full amount that had been

25 entrusted to Old Republic for reconveyance processing and tracking by borrowers.

26 TROY X. KELLEY and Post Closing Department employees subsequently cashed those

27 checks, depositing the funds into an account at Columbia Bank that Post Closing

28 Department used to hold funds received from Old Republic.  In doing so, TROY X.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   KELLEY and the employees caused wire communications to be transmitted in interstate

2   commerce in order to effect the transactions.

3       39.    To track Old Republic's reconveyances, Post Closing Department

4   employees entered the data for each reconveyance into a line in a large spreadsheet.  Post

5   Closing Department then tracked the reconveyances by logging onto county recorder's

6   offices' websites to check the status of the reconveyances.  When a title was reconveyed,

7   an employee noted the number assigned to the reconveyance in a spreadsheet.  Because

8   employees understood that Post Closing Department received a flat $20 fee per

9   transaction tracked regardless of the amount of work involved, the employees did not use

10   the spreadsheet to record the specific tasks they performed on each file.

11       40.    Unbeknownst to Old Republic and borrowers, and contrary to his

12   representations and promises, TROY X. KELLEY directed Post Closing Department

13   employees to issue refund checks in only two limited situations.  First, when an escrow

14   company or a borrower complained that the borrower had not received a refund to which

15   the borrower was entitled, TROY X. KELLEY directed an employee to issue a refund

16   check to that borrower.  Second, on rare occasions, TROY X. KELLEY directed Post

17   Closing Department employees to issue small batches of refund checks.  TROY X.

18   KELLEY did this either to respond to questions from Old Republic, or to create a defense

19   in the event that he subsequently was questioned about Post Closing Department's

20   actions.

21       41.    To conceal from Old Republic the fact that Post Closing Department was

22   keeping unused reconveyance-processing fees, TROY X. KELLEY falsely and

23   fraudulently represented to Old Republic that Post Closing Department continued to

24   charge only a flat $20 fee per transaction tracked.  For example, on March 26, 2007, a

25   representative of Old Republic emailed Post Closing Department asking, among other

26   things, "[d]o you have a fee schedule . . . ?"  TROY X. KELLEY caused an employee of

27   Post Closing Department to respond, "[t]he fee is $20 flat for each item (each DOT to be

28   tracked)."

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

42.     On July 26, 2007, TROY X. KELLEY again represented that Post Closing Department charged a flat fee in an email to an Old Republic employee in which he stated, in relevant part:

> It seems that most companies are raising their trustee (recon) fee by $10 to offset the two County Recorder's increases. Thus they are having us increase the funds held by $10. Our $20 tracking fee does NOT change.

43.     At some point, Old Republic employees in fact requested proof that Post Closing Department was using reconveyance fees appropriately.  Thereafter, TROY X. KELLEY regularly directed a Post Closing Department employee to produce "zeroed out" spreadsheets.  These spreadsheets showed that all reconveyance fees relating to borrowers whose reconveyances were complete had been (1) paid out as third-party fees to trustees or county recorder's offices, or (2) refunded to borrowers.  TROY X. KELLEY provided the employee the check number that supposedly had been used to make one payment, and directed that the employee have the spreadsheets show that payments relating to other borrowers had been made using the next-in-sequence checks.

44.     After the Post Closing Department employee prepared "zeroed out" spreadsheets that falsely showed that large numbers of third-party and refund payments had been made, TROY X. KELLEY caused the spreadsheets to be provided to the Old Republic personnel who had requested the information as supposed proof that Post Closing Department was handling reconveyance fees appropriately.  In truth and in fact, TROY X. KELLEY well knew that Post Closing Department had not made the payments to trustees and county recorder's offices shown in the spreadsheets, and that it was not paying refunds as required.

45.     Because major lenders processed the vast majority of the reconveyances that Post Closing Department tracked for Old Republic, Post Closing Department retained a substantial amount of unused reconveyance-processing fees.  Between June 2006 and June 2008, Old Republic asked Post Closing Department to track approximately 11,773 reconveyances.  Of these, Old Republic collected reconveyance

1    fees in an amount designed to cover reconveyance-processing costs, as well as

2    reconveyance-tracking costs, in approximately 9,072 cases.

3    46.    By June 2008, more than 3,500 of the reconveyances that Post Closing

4    Department was tracking for Old Republic had been completed.  With respect to those

5    reconveyed transactions, Post Closing Department had been required to issue only

6    approximately 150 checks to pay reconveyance-processing fees.  Accordingly, Post

7    Closing Department should have refunded unused reconveyance-processing fees to

8    thousands of borrowers.  In fact, however, Post Closing Department issued only

9    approximately 30 refund checks, totaling approximately $5,660, to borrowers.  (Post

10   Closing Department had issued approximately 423 additional checks to pay

11   reconveyance-processing fees from bank accounts not related to specific escrow

12   companies, and had issued approximately 34 additional refund checks, totaling

13   approximately $8,837, from such accounts.  Some of those checks may have related to

14   borrowers in transactions that Post Closing Department tracked for Old Republic.)

15   47.    Instead of refunding unused reconveyance-processing fees to borrowers,

16   TROY X. KELLEY retained the vast majority of these fees in the Columbia Bank

17   account from which he conducted Old Republic business.  As a result, the balance in this

18   account had grown to $888,949 by June 2008.  (In addition, between June 2006 and June

19   2008, TROY X. KELLY transferred approximately $95,000 from the account to his

20   personal account at Bank of America.)

21   **IV.    The Tax Fraud Scheme**

22   48.    Under federal law relating to taxation, income must be reported in the tax

23   year in which it is received or earned.

24   49.    IRS Form 1065, U.S. Return of Partnership Income ("Form 1065"), is an

25   IRS form used to report the income and deductions of a partnership.  Generally,

26   partnership income flows through to partners, according to their share in the partnership.

27   United National reported its income as a partnership using IRS Form 1065.  From 2006

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   through 2008, United National's income flowed through to its partners, including

2   Blackstone and ATS.

3        50.    IRS Form 1120S, U.S. Income Tax Return for an S Corporation ("Form

4   1120S") is an IRS form used to report the income and deductions of an S Corporation.

5   S Corporation income flows through to the corporation's owners, according to their share

6   in the S Corporation.  Blackstone and ATS reported their income using Form 1120S.

7   From 2006 through 2008, Blackstone's income flowed through to its sole owner, TROY

8   X. KELLEY, and ATS' income flowed through to its sole owner, D.D.K.

9        51.    IRS Form 1040, U.S. Individual Income Tax Return ("Form 1040"), is an

10  IRS form used by individual taxpayers to report their annual income, deductions, and

11  credits, and their tax due and owing.

12       52.    Having fraudulently obtained and stolen funds from Fidelity, Old Republic,

13  and borrowers, TROY X. KELLEY sought to avoid payment of taxes on those funds.  In

14  addition, TROY X. KELLEY realized that the escrow companies and borrowers might

15  seek the return of their funds.  Accordingly, TROY X. KELLEY particularly sought to

16  avoid payment of taxes on the funds until after any such potential claims were resolved.

17  As a result, for tax years between 2006 and 2008, TROY X. KELLEY underreported the

18  income he earned.

19       53.    On or about February 28, 2007, TROY X. KELLEY filed a Form 1065

20  partnership return for United National for the tax year 2006.  On or about February 28,

21  2008, TROY X. KELLEY filed a Form 1065 partnership return for United National for

22  the tax year 2007.  And, on or about October 9, 2008, TROY X. KELLEY filed a Form

23  1065 partnership return for United National for the tax year 2008.

24       54.    These Forms 1065 were false in that they underreported income United

25  National earned between 2006 and 2008 by an aggregate amount of more than

26  $3,000,000.  By underreporting this income, which ultimately flowed through to his and

27  D.D.K's joint personal Forms 1040, TROY X. KELLEY reduced the individual income

28

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 16

1 | taxes he was required to pay for tax years 2006 through 2008 by approximately

2 | $1,000,000.

3 |      55.     In particular, the Form 1065 that TROX X. KELLEY filed for United

4 | National for the tax year 2008, was false in that it underreported income United National

5 | earned during 2008 by in excess of approximately $304,019.  By underreporting this

6 | income, which ultimately flowed through to his and D.D.K.'s personal Form 1040

7 | Individual Income Tax Return, TROY X. KELLEY reduced the individual income taxes

8 | he was required to pay for tax year 2008 by approximately $100,000.

9 | **V.     Obstruction of Civil Lawsuits**

10 |      56.     On May 14, 2008, class action lawsuits were filed in the United States

11 | District Court for the Western District of Washington against Fidelity and Old Republic.

12 | The class actions, *Cornelius v. Fidelity National Title Insurance*, C08-0754MJP (W.D.

13 | Wash.), and *McFerrin v. Old Republic Title*, C08-5309BHS (W.D. Wash.), alleged,

14 | among other things, that Fidelity and Old Republic collected reconveyance-processing

15 | fees from borrowers, that, even though they went unused, "[n]o portion of the

16 | reconveyance processing fees [were] credited or returned with the final settlement," and

17 | that the two companies "kept these duplicative and unearned sums for no settlement

18 | services rendered . . . ."  TROY X. KELLEY learned of the existence of these class action

19 | lawsuits no later than the day after they were filed, that is, May 15, 2008.

20 |      ***A.     TROY X. KELLEY Falsely Claims that Post Closing Department***

21 |      ***Previously Provided a Refund to F.C.***

22 |      57.     In *Cornelius v. Fidelity National Title*, Post Closing Department had

23 | performed the tracking services for the lead plaintiff, F.C.'s, real estate transaction.  As

24 | TROY X. KELLEY well knew, Fidelity had delivered to Post Closing Department the

25 | $280 in reconveyance fees entrusted to Fidelity by F.C., to cover two reconveyances

26 | involved in F.C.'s refinance.

27 |      58.     As TROY X. KELLEY also well knew, despite the fact that Post Closing

28 | Department had not been required to pay any trustee fees or county recording fees, Post

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1 │ Closing Department had kept the entire reconveyance fee, rather than refund all but the

2 │ $30 to which it was entitled for tracking two reconveyances.  To divert attention from this

3 │ fact, and thereby seek to avoid being made a defendant in the class action lawsuits, and

4 │ also to discredit and disqualify F.C. as a plaintiff, TROY X. KELLEY sought to convince

5 │ F.C. that Post Closing Department had timely sent him a refund of his reconveyance-

6 │ processing fees.

7 │      59.    On May 16, 2008, at 9:17 a.m., TROY X. KELLEY used an ATM at a

8 │ Bank of America branch near his home to withdraw $300 in cash from his personal Bank

9 │ of America account.  TROY X. KELLEY immediately traveled to a nearby Washington

10 │ Mutual Bank branch.  There, at 9:27 a.m., TROY X. KELLEY used the cash to purchase

11 │ a $250 cashier's check payable to F.C.  To avoid fees associated with the purchase of the

12 │ cashier's check, TROY X. KELLEY provided Washington Mutual Bank with the account

13 │ number for his Washington Mutual Bank campaign finance account in the name of

14 │ Friends of Troy Kelley.  Finally, because he paid for this check using money withdrawn

15 │ from his personal account, TROY X. KELLEY wrote a check dated May 16, 2008, on the

16 │ Post Closing Department account at Columbia Bank that he used for Fidelity business,

17 │ and made it payable to himself in the amount of $250.  On the memo line, TROY X.

18 │ KELLEY wrote the word "reimbursement."

19 │      60.    TROY X. KELLEY caused the $250 cashier's check that he had purchased

20 │ to be mailed to F.C.  In an accompanying letter, TROY X. KELLEY acknowledged that

21 │ Post Closing Department was entitled to a flat reconveyance-tracking fee of $15 per

22 │ reconveyance, and falsely claimed that Post Closing Department previously had refunded

23 │ the remainder of F.C.'s reconveyance fees to F.C., but that F.C. had failed to cash Post

24 │ Closing Department's check.  The letter, which was not signed, provided in relevant part:

25 │      Dear [F.C.]:

26 │

27 │      A review of our records shows that you did not cash
   │      our check of January 7, 2008.  The letter mailed to you was

28 │      not returned by the post office, and you have not contacted
   │      Fidelity National Title or The Post Closing Department since

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

the time your escrow closed. That check is now stale dated and you should not cash it.

We are enclosing an official bank check to zero out your account balance, and mailing it to you with proof of mailing.

The enclosed official bank check is for $250. Fidelity National Title collected $140 on the payoff of each deed of trust. $15 was charged to track each reconveyance. There was a balance on each deed of trust of $125 when the beneficiary secured the reconveyance. This recording of the reconveyance may have been after being contacted by the Post Closing Department to confirm that the document was being processed. Thus, you are being refunded $125 for each deed of trust that was paid off in escrow for a total of $250.

61. TROY X. KELLEY also included with the cashier's check a copy of the letter that Post Closing Department allegedly had sent to F.C. on January 7, 2008. In the letter, TROY X. KELLEY again acknowledged that Post Closing Department was entitled to retain only a flat $15 tracking fee. TROY X. KELLEY fraudulently placed a slightly-incorrect address in the letter's heading in an attempt to create a plausible explanation for the fact that it never had been delivered to F.C.

**B.** ***TROY X. KELLEY Conceals Post Closing Department's Money***

62. Within a month after learning of the class action lawsuits, TROY X. KELLEY sought to conceal $3,782,226 held in Post Closing Department's Columbia Bank accounts by moving the money through a series of convoluted wire transfers through various newly-opened bank accounts. As part of this series of transfers, TROY X. KELLEY transferred the money out of the State of Washington and into accounts opened in the name of entities not associated with United National or Post Closing Department.

63. On June 10, 2008, TROY X. KELLEY opened an account at Wells Fargo Bank in the name of United National. On June 12, 2008, TROY X. KELLEY wire transferred (1) $2,361,181 from the Columbia Bank account that he had used for Fidelity

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 19

1   business, (2) $888,949 from the Columbia Bank account that he had used for Old

2   Republic business, and (3) $532,096 from the Columbia Bank account number that he

3   had used for Stewart Title business, for a combined total of $3,782,226, into the newly

4   opened account at Wells Fargo Bank.

5        64.    On June 12, 2008, TROY X. KELLEY opened an account at U.S. Bank in

6   the name of United National.  On June 13, 2008, TROY X. KELLEY wire transferred

7   $3,785,667 from the United National account at Wells Fargo Bank to the newly-opened

8   United National account at U.S. Bank.

9        65.    On June 17, 2008, TROY X. KELLEY opened an account at Nevada State

10  Bank in the name of Blackstone.  On June 18, 2008, TROY X. KELLEY wire transferred

11  $3,784,619 from the United National account at U.S. Bank to the newly-opened

12  Blackstone account at Nevada State Bank in Nevada.

13       66.    On June 23, 2008, TROY X. KELLEY formed Berkeley United, LLC

14  ("Berkeley United"), a Nevada limited liability company.  At approximately the same

15  time, TROY X. KELLEY formed Wellington Trust, a trust organized under the laws of

16  Belize.  Although TROY X. KELLEY did not technically own Wellington Trust, for all

17  practical purposes, TROY X. KELLEY controlled the trust, which operated for his

18  benefit.  Wellington Trust owned 99% of Berkeley United.  Blackstone owned the

19  remaining 1%.

20       67.    On June 26, 2008, TROY X. KELLEY opened an account at Vanguard in

21  the name of Berkeley United.  On June 27, 2008, TROY X. KELLEY transferred

22  $3,634,673 from the Blackstone account at Nevada State Bank, in Nevada, to the newly-

23  opened Berkeley United account at Vanguard, in Pennsylvania.

24       68.    Between January 2006 and June 2008, Post Closing Department failed to

25  refund to borrowers (in the case of completed reconveyances) or to Fidelity or Old

26  Republic (in the case of reconveyances that had not yet been completed when Post

27  Closing Department ceased operations), a total of at least approximately $2,964,679.  Of

28  this amount, at least approximately $1,618,744 was included in money that TROY X.

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 20

1   KELLEY transferred to the Blackstone account at the Bank of Nevada on June 18, 2008,

2   and at least approximately $1,463,171 was included in the money that TROY X.

3   KELLEY held in the Berkeley United account at Vanguard on January 1, 2011.

4         **C.**    ***TROY X. KELLEY Shuts Down Post Closing Department***

5         69.    In approximately June 2008, TROY X. KELLY transferred Post Closing

6   Department's two remaining employees in the State of Washington from Post Closing

7   Department's payroll to the payroll of ATS.  On the evening of June 25, 2008, a fire was

8   reported at the Stewart Title offices in Everett, Washington.  By 11:00 p.m., on June 25,

9   2008, Stewart Title had burned to the ground.  TROY X. KELLEY subsequently

10   represented that all of Post Closing Department's records had been destroyed in that fire

11   and in a subsequent crash of his computer.

12         70.    On August 11, 2008, having shut down Post Closing Department's

13   operations in the States of Washington and Oregon, TROY X. KELLEY filed a

14   Certificate of Withdrawal/Cancellation with the Washington State Secretary of State,

15   thereby immediately canceling the registration of United National, d/b/a Post Closing

16   Department.

17         71.    On September 23, 2008, after learning of the existence of Post Closing

18   Department, the class action plaintiffs served TROY X. KELLEY with subpoenas

19   demanding that he produce books and records.  On that same date, to ensure his ability to

20   further conceal the funds he previously had hidden from the class action litigants, TROY

21   X. KELLEY submitted to Vanguard an International Wire Option Form, providing him

22   with the option of wiring funds from the Berkeley United account at Vanguard, to an

23   account in the name of Wellington Trust at Atlantic International Bank in Belize.

24         **D.**    ***Old Republic Sues TROY X. KELLEY, and TROY X. KELLEY Seeks to***
25             ***Conceal from Old Republic the Location of its Funds and Makes False***
26             ***Declarations in a Deposition***

27         72.    On March 3, 2009, counsel for class-action defendant Old Republic filed a

28   third-party complaint against TROY X. KELLEY charging, among other things, that, by

    failing to refund unused reconveyance-processing fees to borrowers, Post-Closing

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  Department had breached its agreement with, and been unjustly enriched to the detriment

2  of, Old Republic.

3    73.    Between March 2009, and September 8, 2009, counsel for Fidelity sought

4  to locate the stolen funds that TROY X. KELLEY had concealed.  They did so by issuing

5  subpoenas to Columbia Bank, Wells Fargo Bank, Washington Mutual Bank, U.S. Bank,

6  HSBC, and, ultimately, on September 8, 2009, to the Vanguard Group.

7    74.    On July 9, 2009, and October 29, 2009, after finding that Old Republic,

8  which had disclosed the payment of reconveyance fees to Post Closing Department in the

9  settlement document that the plaintiffs signed at their closing, had not breached any

10  agreement with, or duty of good faith to, the plaintiffs, the Court dismissed the class

11  action lawsuit against Old Republic.  Likewise, on April 1, 2010, the Court dismissed the

12  class action lawsuit against Fidelity.

13    75.    On December 10, 2009, Old Republic filed a new lawsuit against TROY X.

14  KELLEY, in King County Superior Court.  On June 6, 2010, that lawsuit was removed to

15  the United States District Court for the Western District of Washington, *Old Republic*

16  *Title, Ltd.  v. Troy X. Kelley, et al.,* No. C10-0038JLR (W.D. Wash.).  All of Old

17  Republic's claims stemmed from its core allegation that TROY X. KELLEY had agreed,

18  in June 2006, to perform reconveyance-tracking services for a flat fee of $20 per escrow

19  transaction, and to refund all other unused reconveyance fees to borrowers, but that

20  TROY X. KELLEY instead improperly had kept the unused fees.

21    76.    As part of the civil discovery in the *Old Republic Title* case, written

22  interrogatories were served upon TROY X. KELLEY.  A key objective of these

23  interrogatories was locating the reconveyance fees that were entrusted to Old Republic

24  and then provided to Post Closing Department pursuant to borrowers' escrow

25  instructions.  In his responses to those interrogatories, TROY X. KELLEY repeatedly

26  sought to conceal the Berkeley United account at Vanguard that held the fees.

27    77.    Thus, Interrogatory 15 of Old Republic's First Set of Interrogatories

28  required TROY X. KELLEY to disclose all entities in which he held an ownership

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 22

interest.  On February 22, 2010, TROY X. KELLEY submitted a response that objected to the interrogatory in general terms and did not provide any substantive response.  On March 25, 2010, TROY X. KELLEY submitted a supplemental response stating that his response to another interrogatory (which he described as Interrogatory 15, but by which he likely intended to refer to Interrogatory 16) responded to the question.  On July 26, 2010, TROY X. KELLEY again supplemented his response, stating:

- The Kelleys were and are the sole owners of the stock of Blackstone International, Inc.;
- the Kelleys were the sole owners of the LLC interest in United National, LLC, prior to its cancellation;
- the Kelleys were the sole owners of the LLC interest in United National 14, LLC, prior to its cancellation;
- the Kelleys were and are the sole owners Attorney Trust Services, Inc.;
- the Kelleys control the education foundation and Mr. Kelley controls and the campaign organization, but they do not have an "ownership interest" in them.

In truth and in fact, as TROY X. KELLEY well knew, Blackstone held a 1% ownership interest, and Wellington Trust, which for all practical purposes TROY X. KELLEY controlled, held the remaining 99% interest, in Berkeley United, the entity that held the Vanguard account into which TROY X. KELLEY had moved Old Republic's funds.

78.    Interrogatory 16 required TROY X. KELLEY to disclose all entities in which he was an officer.  On March 25, 2010, TROY X. KELLEY responded to this interrogatory, stating:

Mr. Kelley has formed the following entities, . . . :

Blackstone International Inc. 2000 – present.  (President)
United National LLC, 2002-2008, cancelled.  (President)
United National 14 LLC, 2004-2008, cancelled.  (President)
Attorney Trustee Services Inc, 2003-present.  (President)
Kelley Education Foundation, 2007-present, very small, give money for education or internships (Chairman)

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1        Friends of Troy Kelley, political association for campaign, 2006-present
2        (Candidate)

3  In truth and in fact, as TROY X. KELLEY well knew, TROY X. KELLEY also was the

4  President of Berkeley United, the entity that held the Vanguard account into which

5  TROY X. KELLEY had moved Old Republic's funds.

6       79.   Interrogatory 18 required TROY X. KELLEY to disclose all bank accounts

7  into which he had "deposited any money originally received from Old Republic."  On

8  March 25, 2010, TROY X. KELLEY responded to this interrogatory, stating "[t]he only

9  account used for the deposit of checks from ORT was #[******]1629 at Columbia Bank.

10  The account was in the name of United National, LLC; dba Post Closing Department."

11  On July 26, 2010, TROY X. KELLEY supplemented his Response to Interrogatory 18, as

12  follows:

13       RESPONSE:  As noted above, the only account used for the
14       deposit of checks was Account No. [******]1629 at
     Columbia Bank.  From time to time, as reflected in the
15       Columbia bank records, United National would transfer funds
     representing service fees from this account to Account No.
16       [******]5529 at Columbia Bank.

17
18       In addition, as also reflected in the Columbia Bank records, at
     the conclusion of United National's reconveyance work for
19       Old Republic, United National transferred the remaining
     funds in Account No. [******]1629 to Wells Fargo Account
20       No. [***-***]3310, another business account held by United
21       National.  At that point, the funds were commingled with
     other funds that United National had received from other
22       business operations, including other reconveyance business.

23
24  In truth and in fact, as TROY X. KELLEY well knew, Berkeley United held a Vanguard

25  account into which TROY X. KELLEY had transferred funds entrusted to Old Republic

26  and then delivered to Post Closing Department pursuant to borrowers' escrow

27  instructions.  By his response to Interrogatory 18, TROY X. KELLEY sought to conceal

28  that bank account.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   80.    On August 2, 2010, TROY X. KELLEY was deposed in *Old Republic Title,*
2   *Ltd. v. Troy Kelley et al.*  During the deposition, counsel for Old Republic directly
3   confronted TROY X. KELLEY about the funds TROY X. KELLEY had concealed in the
4   Vanguard account he had opened in the name of Berkeley United, inquiring "[w]hy were
5   the funds transferred to Berkeley United?"  On January 28, 2011, TROY X. KELLEY
6   supplemented his prior interrogatory responses, admitting both that he had transferred
7   Old Republic's funds to a Vanguard account held by Berkeley United, and that he was
8   the President of Berkeley United.

9   81.    During that same deposition, TROY X. KELLEY also provided false
10  testimony concerning other matters.  Thus, TROY X. KELLEY falsely testified that he
11  had negotiated the right to charge Old Republic additional fees beyond the $20 fee per
12  transaction.  TROY X. KELLEY falsely testified that Post Closing Department's
13  spreadsheets identified and broke down the amounts of these individual fees for each
14  transaction.  And TROY X. KELLEY falsely testified that he did not send the letter to
15  F.C. after the class action lawsuits were filed, or ask anyone to do so.

16  82.    During that same deposition, TROY X. KELLEY also testified that, after
17  shuttering Post Closing Department, he had performed a final reconciliation of all of the
18  work done by Post Closing Department for each of its escrow clients.  TROY X.
19  KELLEY further testified that Post Closing Department was entitled to keep the money
20  in the Berkeley United account as "fees earned" for "services provided."  TROY X.
21  KELLEY also testified that he had not paid tax on this money because, although Post
22  Closing Department had "earned" the money, the income had not yet been "realized."

23  **VI.   Continuation of the Tax Fraud Scheme**

24  83.    On May 3, 2011, Old Republic and TROY X. KELLEY settled *Old*
25  *Republic Title, Ltd. v. Troy Kelley et al.*  Following the settlement TROY X. KELLEY
26  paid Old Republic $1,050,000 drawn from the money in the Berkeley United account at
27  Vanguard, in order that Old Republic could refund the money to borrowers.

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1      84.     After he settled *Old Republic Title, Ltd. v. Troy Kelley et al.*, TROY X.

2 KELLEY maintained approximately $2,581,653 of the funds he had concealed during

3 June 2008 in the Berkeley United account at Vanguard. Beginning in 2011, TROY X.

4 KELLEY transferred $245,000 per year to accounts he controlled, which he then reported

5 as income on Forms 1120S he filed on behalf of Blackstone. TROY X. KELLEY sought

6 to evade the full taxes due and owing on the reported income, however, by fraudulently

7 deducting various items as business expenses, knowing full well that the deductions were

8 not for legitimate business expenses.

9      85.     On or about June 3, 2011, a month after the settlement in *Old Republic*

10 *Title, Ltd. v. Troy Kelley et al.*, TROY X. KELLEY wired $245,030 from the Berkeley

11 United account at Vanguard to a Berkeley United account at Wells Fargo Bank. On June

12 7, 2011, TROY X. KELLEY issued a check on the Wells Fargo Berkeley United account,

13 in the amount of $245,000, to Blackstone. TROY X. KELLEY deposited the check into

14 an account at Columbia Bank in the name of Blackstone.

15      86.     On or about February 28, 2012, TROY X. KELLEY filed a Form 1120S for

16 Blackstone for the tax year 2011. That form stated that Blackstone's business was

17 "[i]nformation [s]ervices," and described its product or service as "[d]ocument

18 [t]racking." TROY X. KELLEY declared that the company made gross profits of

19 $245,000 for tax year 2011. Blackstone's declared income for 2011, however, was offset

20 by business expense deductions that totaled $66,147.

21      87.     According to an attached Form 4562 Depreciation and Amortization,

22 approximately $28,535.32 of the declared deductions consisted of depreciation of two

23 vehicles, including a new vehicle purchased in 2011. TROY X. KELLEY indicated in

24 Form 4562 that both vehicles were used 100% for the business. The remaining business

25 deductions were itemized in a personally-prepared schedule entitled "Profit & Loss

26 Statement," and appended to Blackstone's return. The schedule noted, for example,

27 $5,162.21 in fuel expenses, $8,830.40 in business travel, $3,065.48 in conference

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   education expenses, $7,402.12 in sales expenses, and $2,974.35 for subscriptions and

2   books.

3         88.    In truth and fact, as TROY X. KELLEY well knew, many of the expenses

4   that TROY X. KELLEY declared as business deductions on Blackstone's Form 1120S

5   were personal expenses, and the expenses were not expenses associated with any

6   business that Blackstone had engaged in during the tax year 2011.

7         89.    On about January 6, 2012, TROY X. KELLEY issued a check on the

8   Berkeley United account at Vanguard, in the amount of $245,000, to Blackstone, which

9   he deposited into Blackstone's account at Columbia Bank.  On about February 1, 2012,

10  TROY X. KELLEY transferred the remaining $2,090,818 in the Berkeley United account

11  at Vanguard to an account at Vanguard in the name of Blackstone.

12        90.    On or about February 2, 2013, TROY X. KELLEY filed a Form 1120S on

13  behalf of Blackstone for the tax year 2012, in which he declared gross profits of

14  $245,000, for Blackstone.  As with the previous year's form, that form stated that

15  Blackstone's business was "[i]nformation [s]ervices," and described its product or service

16  as "[d]ocument [t]racking."  Blackstone's declared income in 2012 was offset by

17  business-expense deductions totaling $60,425.

18        91.    Attached to the 2012 Form 1120S was a personally-prepared schedule

19  itemizing the various categories of claimed business expenses.  The schedule noted,

20  among other things, $5,953.85 in fuel costs, $12,573.81 in business travel, $4,979.40 in a

21  category entitled "conference education," $9,975.04 in sales expenses, and $6,270 in

22  depreciation for a vehicle.  On an attached Form 4562, which detailed the depreciated

23  vehicle, TROY X. KELLEY noted that the vehicle claimed was used 100% for business

24  and that the vehicle had been driven 15,000 miles during that year.

25        92.    In truth and fact, as TROY X. KELLEY well knew, many of the expenses

26  that TROY X. KELLEY declared as business deductions on Blackstone's Form 1120S

27  were personal or campaign-related expenses, and at least approximately $57,273 were not

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  expenses associated with any business that Blackstone had engaged in during the tax year

2  2012.

3      93.    On April 19, 2013, at Olympia, IRS Criminal Investigation ("IRS-

4  CI") Special Agents interviewed TROY X. KELLEY.  During the interview, TROY X.

5  KELLEY was asked to explain his tax treatment of the reconveyance fees that TROY X.

6  KELLEY had consolidated in 2008, but did not declare as income on his 2006 to 2008

7  income tax returns. TROY X. KELLEY stated that his company was earning the

8  $245,000 he was transferring to Blackstone each year by continuing to perform work on

9  old reconveyance files.

10     94.    The statements and representations were false because, as TROY X.

11  KELLEY then and there knew, TROY X. KELLEY and Blackstone were not tracking

12  reconveyance transactions.  Post Closing Department had terminated the employees who

13  previously had performed the work.  In addition, TROY X. KELLEY previously had

14  testified under oath that Post Closing Department's files had been destroyed in a fire at

15  Stewart Title's office on June 25, 2008, and in the subsequent crash of TROY X.

16  KELLEY's computer.

17     95.    On or about February 27, 2014, TROY X. KELLEY filed a Form 1120S on

18  behalf of Blackstone for the tax year 2013, in which he declared gross profits of

19  $245,000, the same amount that TROY X. KELLEY had declared on the forms for the

20  previous two years.  Although the form declared $72,446 of business expenses, the

21  principal such expense was legal fees, which totaled $57,945.  Unlike the forms for the

22  previous two years, the form did not declare any depreciation for vehicles.  In addition, it

23  declared substantially-lower amounts of expenses for items such as business travel, and

24  subscriptions and books.

25  **VII.   TROY X. KELLEY Continues to Conceal and Disguise his Illicit Proceeds**

26     96.    In 2006, TROY X. KELLEY was elected to the Washington House of

27  Representatives.  TROY X. KELLEY served three two-year terms in that body.  In 2012,

28

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 28

1   TROY X. KELLEY campaigned for, and was elected, Washington State Auditor, a

2   position that he currently holds.

3          97.    In 2011, after he had funneled the proceeds of his fraudulent business, Post

4   Closing Department, through multiple companies and accounts, and after settlement of

5   the litigation brought by Old Republic, TROY X. KELLEY sought to begin spending for

6   his own benefit the remainder of the proceeds in a manner that would conceal and

7   disguise the nature, location, source, ownership, and control of the funds.

8          98.    As an elected public official, and as a candidate for office, TROY X.

9   KELLEY knew that the source of his income and wealth likely would be subject to

10  additional scrutiny.  TROY X. KELLEY was required to file, at regular intervals,

11  financial disclosure forms with the Washington State Public Disclosure Commission,

12  including a Form F-1, Personal Financial Affairs Statement, or a short-form version of

13  that form (collectively, "F-1 Reports").  F-1 Reports detail a candidate/official's sources

14  of income, investments, and ownership interest in companies.  F-1 Reports are signed and

15  submitted by the candidate/official under penalty of perjury, and are publicly-available

16  through the Washington State Public Disclosure Commission.  Starting with his first F-1

17  Report, filed in 2005, TROY X. KELLEY described Blackstone as a legitimate "holding

18  company" or "company holding investments."

19         99.    TROY X. KELLEY sought to conceal from the victims of his fraud, the

20  government, including the IRS, and the general public, facts relating to his misconduct at

21  Post Closing Department, and, specifically, the fact that a substantial portion of his

22  income and assets derived from his fraudulent conduct.  For example, after settling Old

23  Republic's lawsuit against him, TROY X. KELLEY sought unsuccessfully to seal court

24  records in the case.

25         100.   Rather than pay himself directly the remaining fraud proceeds, beginning in

26  2011, TROY X. KELLEY withdrew $245,000 annually from the remaining fraud

27  proceeds that he held first in the Vanguard account in the name of Berkeley United, and

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  then in the Vanguard account in the name of Blackstone, and funneled the withdrawn

2  funds through another account held in the name of Blackstone.

3     101.   By making annual payments through Blackstone, which TROY X.

4  KELLEY portrayed as a legitimate company, TROY X. KELLEY concealed and

5  disguised and attempted to conceal and disguise the nature, location, source, ownership,

6  and control of the fraud proceeds by making his withdrawals appear as if they were

7  legitimately-earned income of a business that had been operating for many years, rather

8  than derived from his illicit activities at Post Closing Department.

9     102.   In each of 2013, 2014, and 2015, TROY X. KELLEY withdrew an

10  additional $245,000 from the Blackstone account at Vanguard.  As a result, by February

11  27, 2015, the balance on the account had been reduced to $1,355,843.

12     103.   On March 26, 2015, notwithstanding the fact that he had told IRS-CI agents

13  that he still was performing work to earn this money, TROY X. KELLEY wrote two

14  checks on the account -- which he previously had described as an impound account that

15  held moneys that he had not earned -- that reduced the balance in the account to zero.

16  First, TROY X. KELLEY wrote a check to the United States Treasury for $447,421.  On

17  the memo line of that check, TROY X. KELLEY wrote "Form 1040 2016-2020."

18  Second, TROY X. KELLEY wrote a check in the amount of $908,397 to a trust account

19  in Seattle in which the funds were to be held for his benefit.

### COUNT 1
**(Possession and Concealment of Stolen Property)**

23     104.   The allegations set forth in Paragraphs 1 through 103 of this Superseding

24  Indictment are re-alleged and incorporated as if fully set forth herein.

25     105.   From in or about June 2008, to in or about January 2012, at Tacoma, in the

26  Western District of Washington, and elsewhere, TROY X. KELLEY did possess and

27  conceal stolen property, knowing the same to have been stolen, unlawfully converted,

28  and taken, namely, money of a value of $5,000 or more, which money had crossed a State

boundary after being stolen, unlawfully converted, and taken, to wit, funds that were

1  taken by fraud from Fidelity National Title and borrowers between January 2006 and

2  March 2008, taken by fraud from Old Republic Title and borrowers between June 2006

3  and June 2008, and stolen by TROY X. KELLEY between January 2006 and June 2008,

4  and that subsequently were transferred to an account in the name of Blackstone

5  International, Inc., at Nevada State Bank, in the State of Nevada, and further transferred

6  to an account in the name of Berkeley United, LLC, at Vanguard, in the State of

7  Pennsylvania.

8      All in violation of Title 18, United States Code, Section 2315.

9

10              **COUNT 2**

           **(False Declaration)**

11

12      106.   The allegations set forth in Paragraphs 1 through 12, 14 through 94, and

13  102 through 103 of this Superseding Indictment are re-alleged and incorporated as if fully

14  set forth herein.

15      107.   On or about August 2, 2010, at Seattle, in the Western District of

16  Washington, TROY X. KELLEY, while under oath and testifying in a civil deposition,

17  knowingly did make a false material declaration in a proceeding before and ancillary to a

18  court of the United States.

19      108.   On December 10, 2009, Old Republic Title filed a civil lawsuit in King

20  County Superior Court, which was removed to the United States District Court for the

21  Western District of Washington, *Old Republic Title, Ltd v. Troy Kelley, et al.*, C10-

22  0038JLR, on January 6, 2010.  The lawsuit included allegations that, pursuant to TROY

23  X. KELLEY's agreement with Old Republic Title, TROY X. KELLEY and Post Closing

24  Department were obligated to return unused reconveyance-processing fees to borrowers,

25  but did not do so.  Among other things, the lawsuit alleged that this failure constituted a

26  breach of contract and unjust enrichment.   Accordingly, at the time and place of

27  aforesaid deposition, it was material whether, during a previous class action lawsuit in

28  relation to an agreement similar to the one TROY X. KELLEY entered into with Old

Republic Title, TROY X. KELLEY, after the class action lawsuit was filed,

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  acknowledged that he was obligated to pay refunds to borrowers by sending the lead

2  plaintiff, F.C., a $250 refund under cover of a letter acknowledging Post Closing

3  Department's obligation to pay the refund.

4      109.  At the time and place alleged, TROY X. KELLEY appearing as a witness

5  under oath during a deposition, knowingly made the following declarations in response to

6  questions with respect to the material matter alleged, as follows:

    Question:    But you're denying that you sent this letter?

    Answer:    Yes.

    Question:    Or denying a recollection of it?

    Answer:    Yes.

    Question:    Which –

    Answer:    I don't remember this at all.

    Question:    You think it's likely that you sent it?

    Answer:    No.

    Question:    Think it's most likely that you did not?

    Answer:    Yes.

    110.  The answer given by TROY X. KELLEY to the next-to-last question, as he

then and there well knew and believed, was false in that, as he was well aware, TROY X.

KELLEY personally wrote the letter and caused the letter to be written, purchased the

check made payable to F.C. for $250, and sent the letter to F.C.

    All in violation of Title 18, United States Code, Section 1623(a).

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1

## COUNT 3
### (False Declaration)

2

3          111.   The allegations set forth in Paragraphs 1 through 103 of this Superseding

4   Indictment are re-alleged and incorporated as if fully set forth herein.

5          112.   On or about April 8, 2011, at Olympia and Seattle, in the Western District

6   of Washington, TROY X. KELLEY, in a declaration under penalty of perjury as

7   permitted under Title 28, United States Code, Section 1746, knowingly did make a false

8   material declaration in a proceeding before and ancillary to a court of the United States.

9          113.   On December 10, 2009, Old Republic Title filed a civil lawsuit in King

10  County Superior Court, which was removed to the United States District Court for the

11  Western District of Washington, *Old Republic Title, Ltd v. Troy Kelley, et al.*, C10-

12  0038JLR, on January 6, 2010.  The lawsuit included allegations that, pursuant to TROY

13  X. KELLEY's agreement with Old Republic Title, TROY X. KELLEY and Post Closing

14  Department were obligated to return unused reconveyance-processing fees to borrowers,

15  but did not do so.  Among other things, the lawsuit alleged that this failure constituted a

16  breach of contract and unjust enrichment.   Accordingly, it was material whether during a

17  previous class action lawsuit, in relation to an agreement similar to the one TROY X.

18  KELLEY entered into with Old Republic Title, TROY X. KELLEY, after the class action

19  lawsuit was filed, acknowledged that he was obligated to pay refunds to borrowers by

20  sending the lead plaintiff, F.C., a $250 refund under cover of a letter acknowledging Post

21  Closing Department's obligation to pay the refund.

22         114.   At the time and place alleged, TROY X. KELLEY signed and filed with the

23  court a declaration in which he knowingly made the following statement with respect to

24  the material matter alleged:

25              Old Republic has also submitted a copy of a letter from the
                *Cornelius* litigation in which someone tried to return money
26              to the plaintiff in that case.  As I testified at my deposition, I
27              didn't send this letter, and I don't know who did.

28

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 33

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

115.    The aforesaid statement of TROY X. KELLEY, as he then and there well knew and believed, was false in that, as he was well aware, TROY X. KELLEY personally wrote the letter and caused the letter to be written, purchased the check made payable to F.C. for $250, sent the letter to F.C., and knew who sent the letter to F.C.

All in violation of Title 18, United States Code, Section 1623(a).

## COUNT 4
### (False Declaration)

116.    The allegations set forth in Paragraphs 1 through 12, 14 through 94, and 102 through 103 of this Superseding Indictment are re-alleged and incorporated as if fully set forth herein.

117.    On or about August 2, 2010, at Seattle, in the Western District of Washington, TROY X. KELLEY, while under oath and testifying in a civil deposition, knowingly did make a false material declaration in a proceeding before and ancillary to a court of the United States.

118.    On December 10, 2009, Old Republic Title filed a civil lawsuit in King County Superior Court, which was removed to the United States District Court for the Western District of Washington, *Old Republic Title, Ltd v. Troy Kelley, et al.*, C10-0038JLR, on January 6, 2010.  The lawsuit included allegations that, pursuant to TROY X. KELLEY's agreement with Old Republic Title, TROY X. KELLEY and Post Closing Department were obligated to return unused reconveyance-processing fees to borrowers, but did not do so.  Among other things, the lawsuit alleged that this failure constituted a breach of contract and unjust enrichment.   Accordingly, at the time and place of aforesaid deposition, it was material whether any verbal amendments had been made which would allow Post Closing Department to charge more for reconveyance tracking than had been provided for in the written agreement.

119.    At the time and place alleged, TROY X. KELLEY appearing as a witness under oath during a deposition knowingly made the following declaration in response to questions with respect to the material matter alleged, as follows:

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 34

| Question: | Who at Old Republic discussed or negotiated with you any of your charges beyond the $20 fee specified in the agreement with Old Republic? |
| Answer: | Carl [Lago]. |

120.    The aforesaid testimony of TROY X. KELLEY, as he then and there well knew and believed, was false in that Carl Lago never discussed or negotiated with TROY X. KELLEY the option of earning more than $20 per file.

All in violation of Title 18, United States Code, Section 1623(a).

## COUNT 5
### (False Declaration)

121.    The allegations set forth in Paragraphs 1 through 12, 14 through 94, and 102 through 103 of this Superseding Indictment are re-alleged and incorporated as if fully set forth herein.

122.    On or about August 2, 2010, at Seattle, in the Western District of Washington, TROY X. KELLEY, while under oath and testifying in a civil deposition, knowingly did make a false material declaration in a proceeding before and ancillary to a court of the United States.

123.    On December 10, 2009, Old Republic Title filed a civil lawsuit in King County Superior Court, which was removed to the United States District Court for the Western District of Washington, *Old Republic Title, Ltd v. Troy Kelley, et al.*, C10-0038JLR, on January 6, 2010.  The lawsuit included allegations that, pursuant to TROY X. KELLEY's agreement with Old Republic Title, TROY X. KELLEY and Post Closing Department were obligated to return unused reconveyance processing fees to borrowers, but did not do so.  Among other things, the lawsuit alleged that this failure constituted a breach of contract and unjust enrichment.   It was TROY X. KELLEY's position that he had not returned unused reconveyance fees because the agreement he had entered with Old Republic Title had been verbally modified, providing that Post Closing Department could charge additional fees for every task it performed in relation to each file, and, as a

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 35

1    result, there were no unused reconveyance-processing fees.  Accordingly, at the time and

2    place of aforesaid deposition, it was material whether Post Closing Department

3    employees kept records reflecting all of the tasks they performed on each file.

4         124.    At the time and place alleged, TROY X. KELLEY appearing as a witness

5    under oath during a deposition knowingly made the following declarations in response to

6    questions with respect to the material matter alleged, as follows:

7              Question:    So you had a log or spreadsheet?  What word would you use?

8              Answer:    I would use either word.

9              Question:    And it would have a specific breakdown of each of these fees

10                            and expenses on each transaction?

11              Answer:    Correct.

12              Question:    Would it identify who the – what the specific fee was paid to

13                            PCD?

14              Answer:    Correct.

15              Question:    So for example, you mentioned a fee for contacting lenders.

16              Answer:    Correct.

17              Question:    Would it say what the fee was and that this particular fee was

18                            charged to that escrow file and to contact the lender?

19              Answer:    That's exactly how –

20              Question:    It wouldn't just be "PCD fees $55" without indicating what?

21              Answer:    No, there were separate columns for each different fee.

22        125.    The answer given by TROY X. KELLEY to the last question, as he then

23    and there well knew and believed, was false in that, as he was well aware, TROY X.

24    KELLEY had entered into an agreement with Old Republic Title to track its

25    reconveyances for a flat fee of $20.00 per transaction tracked.  Therefore, Post Closing

26    Department employees were not asked to, and did not, keep track of the individual tasks

27

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  they performed on files.  As a result, Post Closing Department's spreadsheets did not

2  identify specific fees paid to Post Closing Department.

3       All in violation of Title 18, United States Code, Section 1623(a).

4

5  **COUNT 6**
   **(Money Laundering)**

6

7      126.   The allegations set forth in Paragraphs 1 through 103 of this Superseding

8  Indictment are re-alleged and incorporated as if fully set forth herein.

9      127.   On or about June 7, 2011, at Tacoma, in the Western District of

10  Washington, and elsewhere, TROY X. KELLEY, did knowingly conduct and attempt to

11  conduct a financial transaction affecting interstate and foreign commerce, to wit, deposit

12  a check in the amount of $245,000 written on an account at Wells Fargo Bank in the

13  name of Berkeley United, LLC, into an account at Columbia Bank in the name of

14  Blackstone International, Inc., which involved the proceeds of a specified unlawful

15  activity, that is, mail fraud, in violation of Title 18, United States Code, Section 1341,

16  and wire fraud in violation of Title 18, United States Code, Section 1343, knowing that

17  the transaction was designed in whole and in part to conceal and disguise the nature,

18  location, source, ownership, and control of the proceeds of specified unlawful activity,

19  and while conducting and attempting to conduct such financial transaction knew that the

20  property involved in the financial transaction represented the proceeds of some form of

21  unlawful activity.

22      All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

23

24  **COUNT 7**
   **(Money Laundering)**

25

26      128.   The allegations set forth in Paragraphs 1 through 103 of this Superseding

27  Indictment are re-alleged and incorporated as if fully set forth herein.

28      129.   On or about January 6, 2012, at Tacoma, in the Western District of

Washington, and elsewhere, TROY X. KELLEY, did knowingly conduct and attempt to

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  conduct a financial transaction affecting interstate and foreign commerce, to wit, deposit

2  a check in the amount of $245,000 written on an account at Vanguard in the name of

3  Berkeley United, LLC, into an account at Columbia Bank in the name of Blackstone

4  International, Inc., which involved the proceeds of a specified unlawful activity, that is,

5  mail fraud, in violation of Title 18, United States Code, Section 1341, and wire fraud in

6  violation of Title 18, United States Code, Section 1343, knowing that the transaction was

7  designed in whole and in part to conceal and disguise the nature, location, source,

8  ownership, and control of the proceeds of specified unlawful activity, and while

9  conducting and attempting to conduct such financial transaction knew that the property

10 involved in the financial transaction represented the proceeds of some form of unlawful

11 activity.

12     All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

13

14                 **COUNT 8**

15            **(Money Laundering)**

16     130.   The allegations set forth in Paragraphs 1 through 103 of this Superseding

17 Indictment are re-alleged and incorporated as if fully set forth herein.

18     131.   On or about January 3, 2013, at Tacoma, in the Western District of

19 Washington, and elsewhere, TROY X. KELLEY, did knowingly conduct and attempt to

20 conduct a financial transaction affecting interstate and foreign commerce, to wit, deposit

21 a check in the amount of $245,000 written on an account at Vanguard in the name of

22 Blackstone International, Inc., into an account at Columbia Bank in the name of

23 Blackstone International, Inc., which involved the proceeds of a specified unlawful

24 activity, that is, mail fraud, in violation of Title 18, United States Code, Section 1341,

25 and wire fraud in violation of Title 18, United States Code, Section 1343, knowing that

26 the transaction was designed in whole and in part to conceal and disguise the nature,

27 location, source, ownership, and control of the proceeds of specified unlawful activity,

28 and while conducting and attempting to conduct such financial transaction knew that the

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 38

1  property involved in the financial transaction represented the proceeds of some form of

2  unlawful activity.

3      All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

4

5  ### COUNT 9

6  **(Money Laundering)**

7      132.   The allegations set forth in Paragraphs 1 through 103 of this Superseding

8  Indictment are re-alleged and incorporated as if fully set forth herein.

9      133.   On or about January 24, 2014, at Tacoma, in the Western District of

10  Washington, and elsewhere, TROY X. KELLEY, did knowingly conduct and attempt to

11  conduct a financial transaction affecting interstate and foreign commerce, to wit, deposit

12  a check in the amount of $245,000 written on an account at Vanguard in the name of

13  Blackstone International, Inc., into an account at Columbia Bank in the name of

14  Blackstone International, Inc., which involved the proceeds of a specified unlawful

15  activity, that is, mail fraud, in violation of Title 18, United States Code, Section 1341,

16  and wire fraud in violation of Title 18, United States Code, Section 1343, knowing that

17  the transaction was designed in whole and in part to conceal and disguise the nature,

18  location, source, ownership, and control of the proceeds of specified unlawful activity,

19  and while conducting and attempting to conduct such financial transaction knew that the

20  property involved in the financial transaction represented the proceeds of some form of

21  unlawful activity.

22      All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

23

24  ### COUNT 10

25  **(Money Laundering)**

26      134.   The allegations set forth in Paragraphs 1 through 103 of this Superseding

27  Indictment are re-alleged and incorporated as if fully set forth herein.

28

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 39

135.    On or about February 2, 2015, at Tacoma, in the Western District of Washington, and elsewhere, TROY X. KELLEY, did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, to wit, deposit by means of wire transfer $245,000 from an account at Vanguard in the name of Blackstone International, Inc., into an account at Columbia Bank in the name of Blackstone International, Inc., which involved the proceeds of a specified unlawful activity, that is, mail fraud, in violation of Title 18, United States Code, Section 1341, and wire fraud in violation of Title 18, United States Code, Section 1343, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

## COUNT 11
### (Corrupt Interference with Internal Revenue Laws)

136.    The allegations set forth in Paragraphs 1 through 103 of this Superseding Indictment are re-alleged and incorporated as if fully set forth herein.

137.    Beginning in or before 2007 and continuing until the present, at Tacoma and elsewhere, in the Western District of Washington, TROY X. KELLEY did corruptly endeavor to obstruct and impede the due administration of the internal revenue laws by failing to declare income that he had obtained by fraud and stolen in the years in which he obtained such income, by falsely declaring a portion of that income in later years in an attempt to make the income legitimate, by claiming fraudulent deductions to reduce his tax obligation on the portion of the income that he did declare, and by making false statements to Internal Revenue Service employees who interviewed him concerning the income.

138.    The Internal Revenue Service ("IRS") is an agency of the United States

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    within the Department of Treasury of the United States responsible for enforcing and

2    administering the tax laws of the United States.  The federal income tax system of the

3    United States relies upon citizens to truthfully, accurately, and timely report income and

4    expense information to the IRS.

5            139.    Between 2006 and 2008, having fraudulently obtained and stolen funds

6    from Fidelity National Title, Old Republic Title, and borrowers, TROY X. KELLEY

7    fully realized that the title companies and borrowers might seek the return of their funds.

8    Accordingly, TROY X. KELLEY sought to avoid payment of taxes on the fraudulently-

9    obtained and stolen funds, at least until after any such action was resolved.

10           140.    To do so, between 2006, and 2008, TROY X. KELLEY deliberately

11   underreported on tax returns for the tax years 2006 through 2008, the income that United

12   National earned and that flowed through to Blackstone and ATS, and then to TROY X.

13   KELLEY's and D.D.K.'s tax returns.  In total, TROY X. KELLEY failed to report a total

14   of more than $3,000,000 of income on United's tax returns for 2006 through 2008.  As a

15   result, TROY X. KELLEY failed to report on his and D.D.K.'s joint tax returns, and to

16   pay, a total of approximately $1,000,000 of taxes for those three years.

17           141.    After failing to report Post Closing Department's true income on United

18   National's tax returns for the years 2006 through 2008, TROY X. KELLEY kept that

19   untaxed money in an account in the name of Berkeley United at Vanguard from 2008

20   through 2011.  On May 3, 2011, TROY X. KELLEY settled the last remaining piece of

21   litigation against him relating to the stolen reconveyance funds.  Following that

22   settlement, TROY X. KELLEY paid Old Republic $1,050,000 drawn from the Berkeley

23   United account at Vanguard, so that Old Republic could refund the money to borrowers.

24           142.    Beginning a month later, on June 3, 2011, TROY X. KELLEY transferred

25   $245,000 per year of this money to accounts that he controlled.  TROY X. KELLEY

26   reported this amount as income on Blackstone tax returns for the years 2011 through at

27   least 2013.  TROY X. KELLEY offset the income by claiming fraudulent deductions for

28   expenses that either were wholly fraudulent or that were for personal expenses, rather

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 41

1  than legitimate business expenses of Blackstone.  TROY X. KELLEY claimed these

2  fraudulent expenses both to reduce his tax obligation, and in an attempt to provide an

3  appearance of legitimacy for Blackstone, which otherwise would have had substantial

4  income but no reported expenses.

5       143.   TROY X. KELLEY claimed $66,147 in fraudulent business deductions on

6  Blackstone's 2011 Form 1120S, and claimed $60,425 in business deductions, at least

7  $57,273 of which were fraudulent, on Blackstone's 2012 Form 1120S.  Because

8  Blackstone's ordinary business income was reportable on TROY X. KELLEY's and

9  D.D.K.'s joint personal tax return, TROY X. KELLEY thereby reduced his own taxable

10  income for each of 2011 and 2012.  The overall effect of the claimed expenses was to

11  reduce TROY X. KELLEY's personal tax obligation by approximately $20,000 in each

12  of 2011 and 2012.

13       144.   When TROY X. KELLEY was interviewed by Internal Revenue Service –

14  Criminal Investigation Special Agents, on April 19, 2013, TROY X. KELLEY made

15  false and fraudulent statements concerning his actions.  In particular, TROY X. KELLEY

16  falsely claimed that Blackstone was continuing to work on reconveyance files, and,

17  thereby, had earned the $245,000 in income that it reported in each of 2011 and 2012.

18       All in violation of Title 26, United States Code, Section 7212(a).

19

20                 **COUNT 12**
          **(Filing False Income Tax Return)**

21

22       145.   The allegations set forth in Paragraphs 1 through 12, 14 through 94, and

23  102 through 103 of this Superseding Indictment are re-alleged and incorporated as if fully

24  set forth herein.

25       146.   On or about October 9, 2008, at Seattle, in the Western District of

26  Washington, TROY X. KELLEY, a resident of Tacoma, Washington, did willfully make

27  and subscribe a US Return of Partnership Income, Form 1065, for United National, LLC

28  for calendar year 2008, which was verified by a written declaration that it was made

under the penalties of perjury and which he did not believe to be true and correct as to

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1 every material matter. That income tax return, which was filed with the Internal Revenue

2 Service, reported "gross receipts or sales" of $198,996, whereas, as TROY X. KELLEY

3 then and there well knew, United National LLC received additional gross receipts not

4 stated on the return, to wit, at least approximately $304,019 of additional gross receipts.

5       All in violation of Title 26, United States Code, Section 7206(1).

6

7                                   **COUNT 13**

8                        **(Filing False Income Tax Return)**

9       147.    The allegations set forth in Paragraphs 1 through 12, 14 through 94, and

10 102 through 103 of this Superseding Indictment are re-alleged and incorporated as if fully

11 set forth herein.

12      148.    On or about March 31, 2009, at Tacoma, in the Western District of

13 Washington, TROY X. KELLEY, a resident of Tacoma, Washington, did willfully make

14 and subscribe a U.S. Individual Income Tax Return, Form 1040, for himself and his wife

15 D.D.K. for calendar year 2008, which was verified by a written declaration that it was

16 made under the penalties of perjury and which he did not believe to be true and correct as

17 to every material matter. That income tax return, which was filed with the Internal

18 Revenue Service, reported income from Blackstone International, Inc., and Attorney

19 Trustee Services, Inc., of $169,868 and total income of $322,659, whereas, as TROY X.

20 KELLEY then and there well knew, he and D.D.K. had income from Blackstone

21 International, Inc., and Attorney Trustee Services, Inc., in addition to the amount stated

22 on the return, to wit, additional income of at least approximately $292,954.

23      All in violation of Title 26, United States Code, Section 7206(1).

24

25                                   **COUNT 14**

26                        **(Filing False Income Tax Return)**

27      149.    The allegations set forth in Paragraphs 1 through 103 of this Superseding

28 Indictment are re-alleged and incorporated as if fully set forth herein.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

150.    On or about February 28, 2012, at Tacoma, in the Western District of Washington, TROY X. KELLEY, a resident of Tacoma, Washington, did willfully make and subscribe a U.S. Income Tax Return for an S Corporation, Form 1120S, for Blackstone International, Inc., for calendar year 2011, which was verified by a written declaration that it was made under the penalties of perjury and which he did not believe to be true and correct as to every material matter.  That income tax return, which was filed with the Internal Revenue Service, reported gross profits of $245,000 and reported business expenses of $66,147 as deductions, whereas, as TROY X. KELLEY then and there well knew, Blackstone International did not have the gross profits declared and had not incurred all of the expenses pursuant to any business it had conducted during 2011.

All in violation of Title 26, United States Code, Section 7206(1).

## COUNT 15
### (Filing False Income Tax Return)

151.    The allegations set forth in Paragraphs 1 through 103 of this Superseding Indictment are re-alleged and incorporated as if fully set forth herein.

152.    On or about February 2, 2013, at Tacoma, in the Western District of Washington, TROY X. KELLEY, a resident of Tacoma, Washington, did willfully make and subscribe a U.S. Income Tax Return for an S Corporation, Form 1120S, for Blackstone International, Inc., for calendar year 2012, which was verified by a written declaration that it was made under the penalties of perjury and which he did not believe to be true and correct as to every material matter.  That income tax return, which was filed with the Internal Revenue Service, reported gross receipts of $245,000 and reported business expenses of $60,425, as deductions, whereas, as TROY X. KELLEY then and there well knew, Blackstone International, Inc., did not have the gross receipts declared and had not incurred $57,273 of the expenses pursuant to any business it had conducted during 2012.

All in violation of Title 26, United States Code, Section 7206(1).

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1

## COUNT 16
### (False Statements)

2

3      153.    The allegations set forth in Paragraphs 1 through 103 of this Superseding

4    Indictment are re-alleged and incorporated as if fully set forth herein.

5      154.    On or about April 19, 2013, at Olympia, within the Western District of

6    Washington, TROY X. KELLEY did willfully and knowingly make a materially false,

7    fictitious, and fraudulent statement and representation in a matter within the jurisdiction

8    of the executive branch of the Government of the United States, by informing Internal

9    Revenue Service – Criminal Investigation Special Agents during an interview that,

10   Blackstone International earned the $245,000 he transferred to Blackstone International,

11   Inc., in each of 2011 and 2012, by continuing to perform work on reconveyance files.

12   The statements and representations were false because, as TROY X. KELLEY then and

13   there knew, TROY X. KELLEY and Blackstone International, Inc., were not performing

14   any significant work tracking reconveyance transactions in 2011 and 2012.

15      All in violation of Title 18, United States Code, Section 1001.

16

## COUNT 17
### (Filing False Income Tax Return)

17

18

19      155.    The allegations set forth in Paragraphs 1 through 103 of this Superseding

20   Indictment are re-alleged and incorporated as if fully set forth herein.

21      156.    On or about February 27, 2014, at Tacoma, in the Western District of

22   Washington, TROY X. KELLEY, a resident of Tacoma, Washington, did willfully make

23   and subscribe a U.S. Income Tax Return for an S Corporation, Form 1120S, for

24   Blackstone International, Inc., for calendar year 2013, which was verified by a written

25   declaration that it was made under the penalties of perjury and which he did not believe

26   to be true and correct as to every material matter.  That income tax return, which was

27   filed with the Internal Revenue Service, reported gross receipts of $245,000, whereas, as

28

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 45

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  TROY X. KELLEY then and there well knew, Blackstone International, Inc., did not

2  have the gross receipts declared during 2013.

3      All in violation of Title 26, United States Code, Section 7206(1).

4

5                       **FORFEITURE ALLEGATION**

6      157.   The allegations contained in Count 1 of this Superseding Indictment are

7  hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture

8  pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States

9  Code, Section 2461(c).

10      158.   Upon conviction of the offense of Possession and Concealment of Stolen

11  Property in violation of Title 18, United States Code, Section 2315, set forth in Count 1

12  above, TROY X. KELLEY shall forfeit to the United States, pursuant to Title 18, United

13  States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all

14  property, real or personal, that constitutes or is derived from proceeds traceable to such

15  offense, including but not limited to the following property:

16          a.    Money Judgment.  A sum of money equal to approximately

17                $1,463,171, representing the amount of proceeds obtained as a result

18                of the offense set forth in Count 1, above.

19      159.   The allegations contained in Counts 6 through 10 of this Superseding

20  Indictment are hereby re-alleged and incorporated by reference for the purpose of

21  alleging forfeitures pursuant to Title 18, United States Code, Sections 982(a)(1).  Upon

22  conviction of an offense in violation of Title 18, United States Code, Section 1956, the

23  defendant, TROY X. KELLEY, shall forfeit to the United States of America any

24  property, real or personal, involved in such offense, and any property traceable to such

25  property pursuant to Title 18, United States Code, Section 982(a)(1).  The property to be

26  forfeited includes, but is not limited to, the following:

27          a.    The sum of $908,397.51 in United States funds, contained in Bank

28                of America account No. XXXXXXXX3414, that was transferred

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1
2
3
        from Vanguard Prime Money Market Fund Account XXXX6680, held in the name of Blackstone International, Inc., on March 26, 2015.

4
5
6
    b.    The sum of $447,421.00 in United States funds that was transferred from Vanguard Prime Money Market Fund Account XXXX6680, held in the name of Blackstone International, Inc., on March 26, 2015.

7
8
9
    160.    If any of the property described above, as a result of any act or omission of the defendant:

10
    a.    cannot be located upon the exercise of due diligence;

11
    b.    has been transferred or sold to, or deposited with, a third party;

12
    c.    has been placed beyond the jurisdiction of the court;

13
    d.    has been substantially diminished in value; or

14
15
    e.    has been commingled with other property which cannot be divided without difficulty,

16 //
17 //
18 //
19
20
21
22
23
24
25
26
27
28

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 47

1   the United States of America shall be entitled to forfeiture of substitute property pursuant

2   to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States

3   Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

A TRUE BILL:

DATED: 9/03/2015

Signature of Foreperson redacted pursuant
to the policy of the Judicial Conference of the
United States

_____
FOREPERSON

ANNETTE L. HAYES
United States Attorney

ANDREW C. FRIEDMAN
Assistant United States Attorney

KATHERYN K. FRIERSON
Assistant United States Attorney

ARLEN R. STORM
Assistant United States Attorney

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 48

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800