The Honorable Ronald B. Leighton

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff<br><br>          v.<br><br>TROY X. KELLEY,<br><br>                    Defendant. | NO. CR 15-5198RBL<br><br>UNITED STATES' BRIEF<br>CONCERNING RULE 41(g) HEARING |

Comes now the United States of America, by and through Annette L. Hayes, United States Attorney for the Western District of Washington, and Richard E. Cohen and Andrew C. Friedman, Assistant United States Attorneys for said District, and files this United States' Brief Regarding Rule 41(g) Hearing.

## I.     INTRODUCTION

On September 2, 2015, the United States obtained a civil seizure warrant to seize $908,397.51 of funds that Defendant, Troy Kelley, had transferred to the trust account of his then-counsel, the law firm of Davis Wright Tremaine LLP.  The United States subsequently executed that warrant and seized the money.  On Kelley's motion, the Court has ordered a hearing pursuant to Federal Rule of Criminal Procedure 41(g) concerning Kelley's claim that he is entitled to the return of the money.

UNITED STATES' BRIEF CONCERNING RULE 41(g) HEARING/
KELLEY (No. CR15-5198RBL) - 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   The evidence at the hearing will show that Kelley, who has the burden of proving
2   that he is entitled to the return of the money, cannot meet that burden.  Kelley cannot do
3   so because the money is subject to forfeiture, one of the grounds for denial of a Rule
4   41(g) motion.  As a result, the Court should deny Kelley's request for the return of the
5   money.

6   ## II.   FACTS

7   ### A.  Kelley's Fraud

8   The Government expects that the evidence will show that Kelley operated a
9   business, United National, LLC, d/b/a Post Closing Department, during the years leading
10  up to and including 2008.[1]  The majority owner of United National was Blackstone
11  International, Inc., an S Corporation owned by Kelley.  The principal minority owner of
12  United National was Attorney Trustee Services, Inc., an S Corporation established and
13  controlled by Kelley and his wife.

14  Post Closing Department provided reconveyance-tracking services to escrow
15  companies.  Individuals who borrow money to purchase or refinance a home generally
16  are required to transfer title to the home to a trustee, who holds that title on behalf of the
17  lender, pursuant to a deed of trust, to secure repayment of the loan.  When the underlying
18  loan is repaid in full, the trustee executes a deed of trust transferring title back to the
19  borrower.  This deed of trust is recorded in public land records.  The entire process is
20  called "reconveyance."  In some cases, trustees charge a fee to prepare and process a
21  deed of trust (a "trustee fee"), and county recording offices generally charge fees to
22  record a reconveyance (a "county recording fee").

---

[1] Notwithstanding the fact that Kelley bears the burden of proof, *see* Order at 18 (Oct. 29, 2015); Part III.A. *infra*, the parties have agreed that the United States will make its evidentiary presentation first.  The United States intends to present testimony from two witnesses, FBI Special Agent Michael Brown and FBI Forensic Accountant Gary Beisheim.  These witnesses' testimony will include hearsay testimony.  Hearsay testimony is admissible because the Federal Rules of Evidence do not apply at a post-seizure hearing challenging the seizure of property and seeking its return.  See *United States v. Walsh*, 712 F.3d 119, 124-25 (2d. Cir. 2013); *United States v. Certain Real Property Located at 263 Weatherbrook Lan*e, 202 F. Supp. 2d 1275 (N.D. Ala. 2002); *see also* Fed. R. Evid. 1101(d)(3) (Federal Rules of Evidence do not apply to miscellaneous proceedings, which include proceedings such as those involving the issuance of a search warrant and preliminary examinations in criminal cases).

UNITED STATES' BRIEF CONCERNING RULE 41(g) HEARING/
KELLEY (No. CR15-5198RBL) - 2

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

During the years leading up to 2008, escrow companies that facilitated real estate closings generally collected $100 to $150 from borrowers, at the time of closing of the transaction in which they were selling or refinancing a property, to ensure that the escrow companies held sufficient funds to cover costs that might be associated with reconveyance, including trustee fees and county recording fees.  Kelley represented to escrow companies that Post Closing Department would take custody of the entire fee paid by borrowers, that it would track reconveyances for the escrow companies for a flat fee of $15 or 20 per reconveyance (the amount varied depending upon the escrow company), that it would pay any necessary trustee fees and county recording fees, and that it would refund any unused moneys to borrowers.

In particular, Kelley represented to Fidelity National Title (Fidelity) that Post Closing Department would track, and entered into a contract with Fidelity to track, reconveyances for $15 per reconveyance.  And, Kelley represented to Old Republic Title (Old Republic) that Post Closing Department would track, and entered into a contract with Old Republic to track, reconveyances for $20 per reconveyance.

In fact, major lenders processed the vast majority of reconveyances that Post Closing Department tracked.  As a result, Post Closing Department did not need to pay any trustee fees or county recording fees to effect the vast majority of reconveyances.  Instead of returning unused reconveyance fees to borrowers as he had promised, however, Kelley and Post Closing Department kept the money, all the while continuing falsely to represent that Post Closing Department was charging a flat fee of only $15 or $20 per reconveyance for its work.  Because Kelley was not refunding to borrowers unused fees that he should have refunded, Kelley accumulated large balances in the bank accounts that held the money.

In 2008, class actions lawsuits were filed against escrow companies seeking the return of unused reconveyance fees.  Almost immediately following the filing of those lawsuits, Kelley ceased conducting business in Washington on behalf of Post Closing Department.  By the time that Kelley shuttered Post Closing Department, the total

UNITED STATES' BRIEF CONCERNING RULE 41(g) HEARING/
KELLEY (No. CR15-5198RBL) - 3

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  amount that Kelley had failed to refund to borrowers for completed reconveyances, or

2  that Kelley should have refunded to borrowers for transactions still pending, was

3  $2,964,679.

4  **B. Kelley's Money Laundering**

5      Of the money that Kelley had stolen, all of it was originally deposited into, and

6  much of it remained in, separate accounts that Kelley maintained at Columbia Bank for

7  each of the title companies to which he provided services.  These included an account

8  that Kelley used for Fidelity business that contained $2,361,181 and an account that

9  Kelley used for Old Republic business that contained $889,949.   Using the most

10  conservative accounting principles (which assume that every dollar previously withdrawn

11  from these accounts was a stolen dollar that Kelley should have refunded), a total of at

12  least $1,618,744.95 in these two accounts was money that Kelley should have refunded.

13      On June 12, 2008, Kelley wire transferred the money from the Fidelity and Old

14  Republic accounts, as well as an additional $532,096 from a third account that Kelley

15  used for Stewart Title business, for a combined total of $3,782,226, to a single a newly-

16  opened account in the name of United National at Wells Fargo Bank.  Because this

17  included all of the money from the Fidelity and Old Republic accounts, at least

18  $1,618,744.95 of this amount was stolen money.

19      After he had moved this money to the new account at Wells Fargo, Kelley

20  engaged in further series of transactions designed to hide the money.  Specifically,

21  ■ On June 12, 2008, Kelley opened an account at U.S. Bank in
22  the name of United National.  On June 13, 2008, Kelley wire
23  transferred $3,785,667 from the United National account at
   Wells Fargo Bank to this new account.

24  ■ On June 17, 2008, Kelley opened an account at Nevada State
25  Bank, in the State of Nevada, in the name of Blackstone
26  International.  On June 18, 2008, Kelley wire transferred
27  $3,784,619 from the United National at U.S. Bank to
   this new account.  Of this amount, at least $1,618,694.45 was
28  money that Kelley had stolen.

1

2
- In June 2008, Kelley formed two new entities, Berkeley
3
  United, LLC, a Nevada limited liability company, and
4
  Wellington Trust, a Belize trust.  Initially, Blackstone
  International owned 100% of Berkeley United.  Wellington
5
  Trust also was controlled by Blackstone International, and,
  through it, Kelley.
6

7
- On June 26, 2008, Kelley opened an account at Vanguard, in
  the State of Pennsylvania, in the name of Berkeley United.
8
  And on June 27, 2008, Kelley wire transferred $3,634,673
9
  from the Blackstone International account at Nevada State
  Bank to this new account.  Of this amount, at least
10
  $1,466,700.81 was money that Kelley had stolen.

11

12
- On July 28, 2008, Kelley transferred a 99% ownership
  interest in Berkeley United to Wellington Trust.
13

14      The last financial transaction – that is, the June 27, 2008, wire transfer from the

15   Blackstone International account at Nevada State Bank to the Berkeley United account at

16   Vanguard –  is the money-laundering transaction on which the United States' civil

17   forfeiture warrant was based.  After Kelley transferred the money that he had stolen from

18   the United National account at U.S. Bank to the Blackstone International account at

19   Nevada State Bank, Kelley possessed stolen money, that he knew had been stolen, of a

20   value of $5,000 or more, that had crossed a state line (by travelling to Nevada), in

21   violation of 18 U.S.C. § 2315.  Kelley's subsequent transfer of that money, to the

22   Vanguard account in the name Berkeley United, was a financial transaction with

23   proceeds of specified unlawful activity (namely, possession of stolen property), designed

24   to conceal the nature, location, source ownership, or control of the property, in violation

25   of 18 U.S.C. § 1956(a)(1)(B)(i).[2]

26   _____

27   [2] The elements of 18 U.S.C. § 1956(a)(1)(B)(i) concealment money laundering are that (1) the defendant conducted
     a financial transaction involving property that represented the proceeds of specified prior criminal activity (a
28   category of offenses that includes possession of stolen property), (2) the defendant knew that the property

UNITED STATES' BRIEF CONCERNING RULE 41(g) HEARING/
KELLEY (No. CR15-5198RBL) - 5

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## C. Subsequent Tracing of the Money

After he transferred the money to the Berkeley United account at Vanguard, Kelley left the money largely untouched for some time, while litigation proceeded.  In May 2011, Kelley settled the lawsuit brought against him by Old Republic (the last piece of litigation that implicated him), and Kelley repaid Old Republic $1,050,000 million drawn from the money in the Berkeley United account at Vanguard.

Following the settlement with Old Republic, Kelley paid $245,000 by check in each of 2011 and 2012 from the account to Blackstone International.  In 2012, Kelley transferred the remaining $2,090,818 in the account to an account at Vanguard in the name of Blackstone International and dissolved Berkeley United.  In each of 2013, 2014, and 2015, Kelley withdrew an additional $245,000 from this account.  As a result, by February 27, 2015, the balance in the Blackstone International account had been reduced to $1,355,843.

## D. Government's Investigation

In 2012, Kelley ran for the position of Washington State Auditor.  During the election, Kelley's opponent publicized the litigation involving Kelley.  As a result of that publicity, and resulting news coverage, law enforcement agencies learned of the allegations against Kelley, and, in September 2012, the Internal Revenue Service opened an investigation into Kelley.  Among other things, during the course of its investigation, the United States sought to locate the proceeds of, and money involved in, Kelley's crimes, for purposes of forfeiture.  As part of the investigation, the Government learned of the money in the Blackstone International account at Vanguard.

## E. The Government's Seizure of the $908,397.51

On March 26, 2015, after he had been informed that he would be indicted on or before April 15, 2015, and after he was aware that the likely charges against him included

---

represented the proceeds of prior criminal activity, and (3) the defendant knew the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the prior criminal activity.  Ninth Circuit Model Jury Instruction 8.147.

UNITED STATES' BRIEF CONCERNING RULE 41(g) HEARING/
KELLEY (No. CR15-5198RBL) - 6

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

charges that could support forfeiture, Kelley wrote two checks that reduced the balance in the account at Vanguard to zero.  First, Kelley wrote a check to the United States Treasury, in purported payment of taxes, in the amount of $447,421.  Second, Kelley wrote a check to his then-counsel, Davis Wright Tremaine in the amount of $908,397.51. Davis Wright Tremaine deposited that check into its trust account.

Following the Government's discovery that Kelley had transferred the remaining money in the Vanguard account to Davis Wright Tremaine, the United States and Kelley's then-counsel engaged in discussions concerning the money and the fact that the United States might seek to forfeit the money.  The United States, Kelley, and Davis Wright Tremaine entered into a series of standstill agreements, pursuant to which Kelley and Davis Wright Tremaine agreed not to transfer or diminish the funds.

The last of these agreements, executed on August 4, 2015, barred Kelley from withdrawing or diminishing the money for a period of 45 days, and provided that Davis Wright Tremaine would not take any action that would reduce the funds, even if Kelley instructed it to do so.  In other words, it assured the United States that the money would remain in Davis Wright Tremaine's trust account until September 18, 2015, but not thereafter.

In late August 2015, the United States learned that Kelley was in the process of hiring his current counsel to replace Davis Wright Tremaine as his counsel.  Because the restrictions imposed by the Standstill Agreement were scheduled to expire in the near future, because the United States was uncertain what Davis Wright Tremaine might believe it was required to do should Kelley instruct the firm to return the money once the Standstill Agreement expired, and after confirming that Kelley had other money available to fund a legal defense, the United States applied for a civil seizure warrant to seize the money, pursuant to 18 U.S.C. § 981(a)(1)(A) as property . . . "involved in a transaction . . . in violation of section 1956 of this title, or traceable to such property."  On September 2, 2015, Magistrate Judge Tsuchida issued the warrant, and the United States subsequently executed the warrant and seized the money.

UNITED STATES' BRIEF CONCERNING RULE 41(g) HEARING/
KELLEY (No. CR15-5198RBL) - 7

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

On September 29, 2015, Kelley moved the Court for a pretrial evidentiary hearing concerning the seizure.   By order dated October 29, 2015, this Court granted Kelley's motion and scheduled an evidentiary hearing for December 1-2, 2015.  As noted in the United States' response to Kelley's motion, the United States has 90 days from the date of seizure, that is, until approximately December 2, 2015, to file a civil forfeiture action against the seized funds.  The United States currently plans to file that action on December 2, 2015, following the hearing in this matter.

## III.   ARGUMENT

### A. Legal Framework

The Court's Order characterized this proceeding as a hearing on a motion for return of property under Rule 41(g).  That rule provides

> A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return. . . . The court must receive evidence on any factual issue necessary to decide the motion.  If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings.

Fed. R. Crim. P. 41(g).

It is well-established that a Rule 41(g) motion should be denied "'if the defendant is not entitled to lawful possession of the seized property, the property is contraband or subject to forfeiture or the government's need for the property as evidence continues.'" *United States v. Fitzen*, 80 F.3d 387, 388 (9th Cir. 1996) (*quoting United States v. Mills*, 991 F.2d 609, 612 (9th Cir. 1993) (*quoting United States v. Van Cauwenberghe*, 934 F.2d 1048, 1061(9th Cir. 1991))); *see also United States v. Martinson*, 809 F.2d 1364, 1369 (9th Cir. 1987) (defendant is not entitled to return of property where property is subject to federal forfeiture).  In addition, as the Court noted in its Order, the movant, in this case, Kelley, has the burden of showing that he is entitled to the property.  Order at 18; *see also*

1 | *United States v. Gladding,* 775 F.3d 1149 (9th Cir. 2014) (holding that defendant has

2 | burden of proof on a Rule 41(g) motion until trial is complete or defendant pleads guilty).

3 |      Although there is little case law addressing the issue in the context of Rule 41(g)

4 | motions to recover personal property, such as money, case law from analogous contexts

5 | is helpful in understanding the nature of Kelley's burden.  For example, case law

6 | governing motions brought pursuant to 18 U.S.C. § 985(e) to challenge seizures of real

7 | property makes clear that such hearings are not designed to be full trials on the ultimate

8 | issue of forfeiture, but are designed to address only the question of "whether the

9 | Government continues to be justified in continuing its temporary seizure of the property

10 | pending trial."  *United States v. Certain Real Property Located at 263 Weatherbrook*

11 | *Lane*, 202 F. Supp. 2d 1275, 1277 (N.D. Ala. 2002).  As a result, the relevant issue is

12 | whether probable cause exists for the seizure, and courts have required movants to show

13 | an absence of probable cause to obtain the return of their property.  *Id.; see also United*

14 | *States v. Real Prop. Located at 14420 Tukwila Int'l. Blvd.*, 979 F. Supp. 2d 1191-1194-95

15 | (W.D. Wash. 2013).

16 |      This same standard should govern here.  As the Court's Order indicates, Kelley is

17 | arguing that "the $908,397.51 is not contraband subject to forfeiture; the government

18 | seized money it could not lawfully reach prior to conviction and it lacked probable cause

19 | for the seizure."  Order at 18-19.  Thus, at the hearing, it will be Kelley's burden to

20 | establish that the $908,397.51 seized pursuant to a civil seizure warrant is not subject to

21 | forfeiture, and that the United States lacked, and continues to lack, probable cause that

22 | the money is subject to forfeiture.

## B. The Subject Funds are Property Traceable to Property Involved in Money Laundering, and They Therefore are Subject to Forfeiture.

25 |      The civil forfeiture statute, 18 U.S.C. § 981, provides in pertinent part:

> (a)(1) [T]he following property is subject to forfeiture
> to the United States:
>     (A) Any property, real or
>     personal, involved in a

1
2
3
4
5

> transaction or attempted
> transaction in violation of  . . .
> section 1956 or 1957 of this
> title [the federal money
> laundering statutes], or any
> property traceable to such
> property.

6
7
8
9
10
11
12
13
14
15
16
17

The courts, relying on the legislative history of the civil and criminal money laundering statutes, have held that the term "property involved in" a transaction in violation of section 1956 or 1957 "should be read broadly to include the money or other property being laundered (the 'corpus' or 'subject matter' of the money laundering offense); any commission and fees paid to the money launderer; and any property used to facilitate the money laundering offense."  Cassella, Asset Forfeiture Law in the United States § 27-7, at 978  (2d ed. 2013); *see also United States v. Reiner*, 397 F. Supp. 2d 101, 112 n.26 (D. Me. 2005) (noting that the scope of forfeiture for money laundering offenses, which applies to property "involved in" the offense, is broader than the scope of forfeiture for offenses for which proceeds of the offense are forfeitable); *United States v. Schlesinger*, 396 F. Supp. 2d 267, 271-72 (E.D. N.Y. 2005) (collecting cases and citing legislative history).

18
19
20
21
22

"There are two ways clean money can be involved in a money laundering offense and subject to forfeiture.  First, if tainted money is commingled with clean money, and money is laundered out of the comingled account - all of the money laundered out of the account constitutes the corpus of the money laundering, not just the tainted money." *United States v. Coffman*, 859 F. Supp. 2d 871, 875-76, (E.D. Ky. 2012).

23
24
25
26
27
28

In *United States v. Huber*, 404 F.3d 1047, 1058 (8th Cir. 2005),  the government forfeited legitimate crop sales proceeds that the defendant had comingled with illegitimate funds in accounts from which he subsequently made payments that constituted money laundering transactions.  "The presence of legitimate funds made the transactions no more lawful because the transactions still *involved* the illegitimate

UNITED STATES' BRIEF CONCERNING RULE 41(g) HEARING/
KELLEY (No. CR15-5198RBL) - 10

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

proceeds.  We can find no basis to conclude that the crop-sales proceeds, although lawfully obtained, were not also laundered in violation of the statute when they were part of the money-laundering transactions.  As funds Huber conspired to launder, they were properly included in the forfeiture judgment as part of the corpus of the money-laundering conspiracy." *Huber,* 404 F.3d at 1058 (emphasis in original; citations omitted).

*Huber* emphasized that, in reaching this decision, it was not relying on the theory that the commingling facilitated the money laundering.  Rather, the mere fact that the commingled funds were part of the money-laundering transaction meant that they were involved in the transaction and therefore were forefeitable.  *See id.* at 1061 n.11 ("if the legitimately obtained funds are part of a transaction that also involved proceeds of a specified unlawful activity, they are forfeitable as the corpus of the money-laundering offense"); *see also United States v. Funds on Deposit at Bank One, Indiana,* 2010 U.S. Dist. LEXIS 22346, at *23-27 (N.D. Ind. Mar. 9, 2010) (when defendant commingled drug proceeds with other funds, transferred commingled moneys in a money-laundering transaction, and then transferred funds from the receiving account to yet another account in another money-laundering transaction, all of the funds in the last transfer were "involved in" a money-laundering transaction and therefore forfeitable).[3]

As a leading treatise makes clear, "if [a] money laundering transaction is the simple movement of commingled money from one place to another, *all* of the money involved in the transaction is subject to forfeiture."  Casella, Asset Forfeiture in the United States § 27-9, at 992 (emphasis in original).  In other words, when funds in an account containing comingled clean money and tainted proceeds are then transferred to

---

[3]   Although the Ninth Circuit has not addressed precisely this issue, the Ninth Circuit addressed a similar issue in *United States v. Garcia,* 37 F.3d 1359 (9th Cir. 1994), and reached a similar result.  In that case, the defendant had transferred money, some of which the government alleged was tainted, in what the government alleged was a money-laundering transaction.  The Ninth Circuit held that the fact that a transaction includes some tainted funds is sufficient to sustain a money-laundering conviction.  *Id.* at 1364 ("We conclude that under the money laundering statutes, due to the fungibility of money, it is sufficient to prove that the funds in question came from an account in which tainted proceeds were commingled with other funds.").

UNITED STATES' BRIEF CONCERNING RULE 41(g) HEARING/
KELLEY (No. CR15-5198RBL) - 11

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  another account, to conceal the nature, location, source, ownership or control of the

2  tainted proceeds, that transaction constitutes the crime of money-laundering and all of the

3  funds involved in that transaction constitute "property involved in money laundering"

4  and are subject to forfeiture as the corpus of the money-laundering crime.  Pursuant to the

5  terms of the statute, all property traceable to those funds also is subject to civil forfeiture

6  to the United States. 18 U.S.C. § 981(a)(1)(A).

7      This is exactly the situation in Kelley's case.  After consolidating the moneys in

8  his various accounts at Columbia Bank, and transferring them in sequence to two newly-

9  opened accounts, on June 18, 2008, Kelley wire transferred $3,784,619 to a newly-

10 opened Blackstone International account at Nevada State Bank.  Included in this money

11 was at least $1,618,694.45 of stolen money that Kelley had failed to refund to borrowers.

12 Kelley's possession of this money constituted possession of stolen property, in violation

13 of 18 U.S.C. §2315, a specified unlawful activity.

14     Kelley's June 27, 2008, transfer of $3,634,673, containing at least $1,466,700.81

15 of stolen funds, from the Blackstone International account at Nevada State Bank to a

16 newly-opened account at Vanguard, held in the name of a newly-formed entity, Berkeley

17 United, was designed to conceal the nature, location, source, ownership, or control of the

18 funds.  As such it was a money-laundering transaction, in violation of 18 U.S.C.

19 § 1956(a)(1)(B)(i).  All of the money transferred – both the stolen money, and the

20 commingled money – was involved in the transaction.  All $3,634,673, therefore was

21 subject to forfeiture.  And, because the $908,397.51 seized by the United States is

22 directly traceable to this money, it also is subject to forfeiture.

23 **C. Kelley's Arguments are Without Merit**

24     In his pleadings to date, Kelley has advanced a number of arguments as to why he

25 believes the $908,397.51 is not forfeitable.  None of Kelley's arguments has merit.

26     **1. Kelley Misconstrues the Theory of the Government's Forfeiture**

27     Kelley argued in his motion seeking an evidentiary hearing that "the seized funds

28 are not traceable to the alleged possession and concealment of stolen property."

UNITED STATES' BRIEF CONCERNING RULE 41(g) HEARING/
KELLEY (No. CR15-5198RBL) - 12

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Defendant's Mot. To Consolidate Proceedings and for Evidentiary Hearing Regarding
2  Pretrial Seizure of Assets, at 9-10.  Kelley claims that "[s]imple arithmetic" shows that
3  the $1,466,700.81 of stolen money transferred to the Berkeley United account at
4  Vanguard all was dissipated prior to the payment of the last $908,397.51 to Davis Wright
5  Tremaine.

6        Kelley's argument fails because the United States is not seeking – in the civil
7  forfeiture proceeding, at least – to forfeit the money as proceeds of the possession of
8  stolen property.  Rather, the United States' civil forfeiture is based on the fact that all
9  $3,634,673, transferred to the Berkeley United account at Vanguard, both tainted money
10 and commingled money, was property involved in a money-laundering transaction.  As a
11 result, all of the money, and all money traceable to the money, became forfeitable.  The
12 $908,397.51 paid to Davis Wright Tremaine is traceable to the $3,634,673, and therefore
13 is forfeitable.

14        **2.  Kelley Misconstrues *United States v. Contents in Account***
15           ***No. 059-644190-69* (D. Vt. 2003)**

16        Kelley relies upon a case from the District of Vermont, *United States v. Contents*
17  *in Account No. 059-644190-69,* 253 F. Supp. 2d 789, 799 (D. Vt. 2003), to argue that, in
18  order to forfeit commingled funds contained in the original money-laundering
19  transaction, the United States must show that the inclusion of the untainted funds in the
20  transaction furthered or facilitated the concealment.  Defendant's Mot. To Consolidate
21  Proceedings and for Evidentiary Hearing Regarding Pretrial Seizure of Assets, at 10-12.
22  Kelley is incorrect for at least two reasons.

23        First, although facilitation is one theory that would support forfeiture, it is not a
24  necessary theory.  As *Coffman* makes clear, clean money can be involved in a money
25  laundering offense in two ways – "[f]irst, if tainted money is commingled with clean
26  money, and money is laundered out of the commingled account – all of the money
27  laundered out of the account constitutes the corpus of the money laundering, not just the
28  tainted money . . . . [second] property derived from legitimate sources can be used to

UNITED STATES' BRIEF CONCERNING RULE 41(g) HEARING/
KELLEY (No. CR15-5198RBL) - 13

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   facilitate money laundering." *Coffman*, 859 F. Supp. 2d 871 (citations omitted).  In other

2   words, facilitation is an alternative theory, not a requirement.  *See also Huber*, 404 F.3d

3   at 1061 n.11 (noting that it was not relying on facilitation theory).

4          Second, *Contents in Account No. 059-644190-69,* did not even involve a situation

5   in which untainted funds were included in a money laundering transaction.  The case

6   involved embezzlement by a claimant, Carol Capoccia, from an organization LCCP.

7   This was accomplished through 25 transfers.  *Contents in Account No. 059-644190-69*,

8   253 F. Supp. 2d at 791; *see also id.* at 800 ("[t]he alleged money laundering in this case

9   occurred as a result of transferring money from LCCP to Capoccia personally.  The fact

10  of the transfer to Capoccia constitutes . . .the money laundering giving rise to the present

11  forfeiture action.")  Thus, the money laundering transactions at issue did not even include

12  untainted funds.  Rather, it appears that the commingling of untainted funds at issue took

13  place *after* the money-laundering transactions in which money was transferred from

14  LCCP to Capoccia.  As a result, no untainted funds were "involved in" money laundering

15  transactions.  The case therefore is entirely unlike – and inapposite to -- the situation in

16  Kelley's case in which potentially-untainted funds were included, and therefore involved,

17  in the actual money-laundering transaction.

18         **3.  Civil Forfeiture is not Barred by the Statute of Limitations**

19         Kelley argued in his motion seeking an evidentiary hearing that the United States

20  cannot seek forfeiture, because the forfeiture is based upon the 2008 transfer of money to

21  the Berkeley United account at Vanguard, and prosecution for that transfer is outside the

22  statute of limitations for criminal prosecution.  Defendant's Mot. To Consolidate

23  Proceedings and for Evidentiary Hearing Regarding Pretrial Seizure of Assets, at 11-12.

24  Again, Kelley is incorrect.

25         The statute of limitations for civil forfeiture actions – as opposed to criminal

26  forfeiture -- is set forth in 19 U.S.C. § 1621.  That statue requires that a civil forfeiture

27  action must be commenced within five years of the time the offense giving rise to the

28  forfeiture was discovered, or within two years of the discovery of the involvement of the

1  property in the offense, whichever is later.  In Kelley's case, law enforcement did not

2  learn of Kelley's fraud at Post Closing Department until it was made a campaign issue by

3  Kelley's opponent for Washington State Auditor during the fall of 2012.  The

4  Government's civil forfeiture action, which will be filed December 2, 2015, will be filed

5  less than five years after the discovery of Kelley's offense.  As a result, the civil

6  forfeiture action is timely.

7      **4.  The FBI Forensic Accountant's Testimony is Credible**

8      Finally, Kelley argued in his motion seeking an evidentiary hearing that the FBI

9  Forensic Accountant in the case's credibility was suspect based upon two disclosures

10  contained in the affidavit filed in support of the civil seizure warrant.  Defendant's Mot.

11  to Consolidate Proceedings and for Evidentiary Hearing Regarding Pretrial Seizure of

12  Assets, at 12-13.  The Government is confident that the Court will find the FBI Forensic

13  Accountant's testimony to be both credible, and supported by and consistent with,

14  exhibits and other evidence in the case.

15  //

16  //

17  //

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES' BRIEF CONCERNING RULE 41(g) HEARING/
KELLEY (No. CR15-5198RBL) - 15

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## IV.   CONCLUSION

Based upon the evidence at the hearing, the Court should find that there is probable cause to believe that the $908,397.51 seized by the United States is forfeitable. As a result, Kelley cannot meet his burden to show that he is entitled to possession of the property, and the Court should deny Kelley's motion for return of the property.

Respectfully submitted,

ANNETTE L. HAYES
United States Attorney

s/ Richard E. Cohen
RICHARD E. COHEN
Assistant United States Attorney

s/ Andrew C. Friedman
ANDREW C. FRIEDMAN
Assistant United States Attorney

700 Stewart Street, Suite 5220
Seattle, Washington  98101-1271
Telephone:   (206) 553-2277
Fax:            (206) 553-0755
E-mail:       Richard.Cohen@usdoj.gov
                 Andrew.Friedman@usdoj.gov

UNITED STATES' BRIEF CONCERNING RULE 41(g) HEARING/
KELLEY (No. CR15-5198RBL) - 16

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

2

**CERTIFICATE OF SERVICE**

3
      I hereby certify that on November 24, 2015, I electronically filed the foregoing

4
with the Clerk of Court using the CM/ECF system which will send notification of such

5
filing to the attorney of record for the defendant.

6

7
                                    s/ Andrew C. Friedman

8
                                    ANDREW C. FRIEDMAN
                                    Assistant United States Attorney

9

10
                                    United States Attorney's Office

11
                                    700 Stewart, Suite 5220
                                    Seattle, Washington  98101-1271

12
                                    Telephone:   206-553-2277
                                    Facsimile:   206-553-0755

13
                                    E-mail:      Andrew.Friedman@usdoj.gov

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970