THE HONORABLE RONALD B. LEIGHTON

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

UNITED STATES OF AMERICA,

Plaintiff,

vs.

TROY X. KELLEY,

Defendant.

Case No. 3:15-cr-05198-RBL

DEFENDANT'S RULE 29 MOTION FOR ACQUITTAL FOLLOWING DISCHARGE OF JURY

**NOTED FOR:**
**MONDAY, JUNE 20, 2016**
**(ORAL ARGUMENT REQUESTED)**

## I. INTRODUCTION

Pursuant to Federal Rule of Criminal Procedure 29, Defendant Troy Kelley moves for a judgment of acquittal on all remaining counts based on the insufficiency of the evidence. This brief specifically addresses Counts 1 and 6–10, 2, and 12.

Count 1 of the Superseding Indictment alleges that Troy Kelley failed to pay refunds owed to borrowers, and thereby possessed and concealed stolen money, in violation of 18 U.S.C. § 2315. That statute makes it a crime for anyone to knowingly possess or conceal money that was "stolen, unlawfully converted, or taken." 18 U.S.C. § 2315. The Court instructed the jury that to find Mr. Kelley guilty, it would have to find that the government had proved that "the property did have an owner," that Mr. Kelley "did not own it, and that he knew he did not." Instruction No. 18. No rational juror could have concluded beyond a

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

reasonable doubt that Mr. Kelley took any property over which anyone other than himself had an established ownership interest.

The evidence clearly showed that under the HUD-1s and escrow instructions—the contracts between the homeowners and the title companies—the homeowners agreed to pay a fee to Mr. Kelley's company, PCD, in exchange for a service. Once closing occurred, the homeowners had no further ownership interest in the fees. Because the borrowers unconditionally agreed to pay the reconveyance fees to Mr. Kelley, his acceptance and retention of those fees cannot be theft.

Second, the government compounded its deficient charges against Mr. Kelley by tacking on five counts of money laundering predicated on mail and wire fraud, arguing that the same conduct constituted both theft and fraud. But because the owner consented and was not defrauded, and the title companies had no ownership interest in the fees, acquittal on Counts 6–10 is required.

Third, Count 2 charges Mr. Kelley with making a false declaration in violation of 18 U.S.C. § 1623 based on two utterances of a statement—once in a deposition, then again in a declaration. But the Supreme Court, in *Dunn v. United States*, 442 U.S. 100, 113 (1979), definitively held that Section 1623 does not "encompass statements made in contexts less formal than a deposition," which has been specifically applied to preclude charges based on declarations or affidavits. The declaration is therefore insufficient to sustain a conviction on Count 2.

Finally, Mr. Kelley previously moved to dismiss Count 12, which alleged that he filed a false tax return for United National in October 2008, on the grounds that the count was time-barred. Dkt. No. 70. The basis for Mr. Kelley's motion was simple: because United National terminated by August 2008, its tax return was due four months later, in December 2008, and the government's indictment in April 2015 was not within the six-year statute of limitations.

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

*Id.* This Court deferred ruling on Mr. Kelley's motion because "[t]he government . . . presented preliminary evidence suggesting Kelley did not properly distribute the assets owed to each partner, and so did not wind up United National by the date alleged." Dkt. No. 105, p. 5. The government has now had its opportunity to prove that United National was not properly wound up and failed to do so. Acquittal on Count 12 is therefore required.

## II. DISCUSSION

### A. Legal Standard.

The Constitution "protects an accused against conviction except upon evidence that is sufficient fairly to support a conclusion that every element of the crime has been established beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 313–14 (1979). Accordingly, "the prevailing criterion for judging motions for acquittal in federal criminal trials" is whether "reasonable jurors must necessarily have [] a reasonable doubt as to guilt," in which case the judge "must require acquittal, because no other result is permissible within the fixed bounds of jury consideration." *Id.* at 318 n.11 (citation and internal quotation marks omitted).

Federal Rule of Criminal Procedure 29(a) provides that a court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." A defendant may move for a judgment of acquittal following discharge of the jury; if the jury has failed to return a verdict, the court may enter a judgment of acquittal. Fed. R. Crim. P. 29(c)(2). The court must grant acquittal if, after viewing the evidence in the light most favorable to the government, no rational juror could have concluded beyond a reasonable doubt that the evidence was sufficient to convict the defendant. *United States v. Katakis*, 800 F.3d 1017, 1023 (9th Cir. 2015); *United States v. Lopez*, 484 F.3d 1186, 1200–01 (9th Cir. 2007). Evidence is insufficient to support a verdict where "mere speculation, rather than reasonable inference, supports the government's case, or where there is a total failure of proof of a

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

requisite element." *Katakis*, 800 F.3d at 1023 (quoting *United States v. Nevils*, 598 F.3d 1158, 1167 (9th Cir. 2010) (en banc)).

### B. The Evidence Was Insufficient To Convict Mr. Kelley for Possession of Stolen Property.

#### 1. The Government Was Required to Prove Mr. Kelley Did Not Own the Allegedly Stolen Property.

To convict Mr. Kelley on Count 1, the jury was instructed that it would have to find that the government had proved that "the property did have an owner," that Mr. Kelley "did not own it, and that he knew he did not." Instruction No. 18. This is because "'[s]tolen' as used in [the National Stolen Property Act (NSPA)] includes all felonious takings . . . with intent to deprive the *owner* of the rights and benefits of *ownership* . . . ." *United States v. Turley*, 352 U.S. 407, 417 (1957) (emphasis added).[1]

Crucially for this case, property transferred with the consent of the owner—or even a mistaken belief that the owner consented—cannot be considered stolen. *United States v. Bennett*, 665 F.2d 16, 22 (2d Cir. 1981) ("Because the concept of 'stolen' property requires an interference with the property rights of its owner, property that has been transported, sold, or otherwise disposed of, with the consent of the owner cannot be considered 'stolen' within the meaning of ss 2312-2315."). Nor is it theft for an owner, or someone at the owner's direction, to take property from someone else in possession of the property. In *United States v. Rogers*, an airplane had been seized by the government and was in its possession and control. The owner, or one of his compatriots, broke in and took equipment from the plane. The Tenth Circuit held that the owner did not steal within the meaning of the NSPA. 786 F.2d 1000, 1003 (10th Cir. 1986) ("[The NSPA] should not be expanded at the government's will beyond

---

[1] *See also United States v. Long Cove Seafood, Inc.*, 582 F.2d 159 (2d Cir. 1978) (dismissing § 2314 charges where the government could not prove ownership of the allegedly stolen goods because the National Stolen Property Act covers only "felonious (taking[s]) with intent to deprive the owner of the rights and benefits of ownership") (quoting *United States v. Turley*, 352 U.S. 407, 417 (1957)); *United States v. Carman*, 577 F.2d 556, 565 (9th Cir. 1978) (property must be taken "from one having the attributes of an owner").

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

the connotation—depriving an owner of its rights in property—conventionally called to mind.") (quoting *United States v. McClain*, 545 F.2d 988, 1002 (5th Cir. 1977)).

**2. A Rational Jury Could Not Have Found that Mr. Kelley Did Not Own the Property.**

Based on the evidence presented at trial, rational jurors would necessarily have a reasonable doubt as to Mr. Kelley's guilt on Count 1. The evidence was overwhelming that the owners of the money—the homeowners—consented to give it to Mr. Kelley. He therefore could not have stolen it under *Bennett*.

The evidence at trial showed that homeowners entered into contracts with title companies, agreeing to pay fees in exchange for services. Those agreements—called escrow instructions—included HUD-1 Settlement Statements that specifically enumerated the fees to be paid at closing, including the reconveyance fees paid to PCD, Mr. Kelley's company. Exs. A-106, A-108, 549, 564, 581. Defense expert Mark Schedler testified that whether something is listed as a fee or a deposit on the HUD-1 tells you "who owns that money after closing. A fee is owned by the recipient of the fee when it is paid. Now, there may be services owed, but it is not the borrower's money anymore." Calfo Decl., Ex. A (Apr. 13, 2016, Trial Tr. at 33:23–35:2).

The reconveyance fee to PCD was not listed on the HUD-1 statements as estimated or as a holdback; it was presented to the borrower as a flat fee. *See* Calfo Decl., Ex. B (Mar. 16, 2016, Trial Tr. at 85:14–21) (testimony of Julie Yates); *id.*, Ex. C (Mar. 23, 2016, Trial Tr. at 23:3–24:18) (testimony of Patty LeVeck); Ex. A-108. Mr. Schedler testified that in this situation, where the HUD-1 lists a "reconveyance fee to the Post Closing Department," "it is being paid to the Post Closing Department, and it will be the Post Closing Department's money when it is paid." Calfo Decl., Ex. A (Apr. 13, 2016, Trial Tr. at 39:23–40:10).

Another defense expert, Jim Savitt, gave his opinion that as a matter of contract law, upon disbursement of the fees to PCD, the homeowners had no ownership interest in the funds.

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

He based this opinion on the escrow instructions and HUD-1s as well as statements made by Old Republic and Fidelity in the class actions. He noted that nothing in the escrow instructions referred to a continuing ownership interest or a trust account. He also pointed to Fidelity's position that there was no obligation to return the fees, which Fidelity could not have said if the homeowners retained an ownership interest.

The evidence was also clear that homeowners were not lied to and that the fee was disclosed to them. On HUD-1 statements, homeowners typically signed underneath a statement providing in part, "I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction." *See, e.g.*, Ex. A-106. Patty LeVeck of Old Republic and Scott Smith, Old Republic's lawyer, both testified that reconveyance fees were plainly disclosed to the homeowners, who agreed to pay them. Calfo Decl., Ex. C (Mar. 23, 2016, Trial Tr. at 27:1–6); *id.*, Ex. D (Mar. 29, 2016, Trial Tr. at 56:21–59:5). In the prior class action litigation, the title companies repeatedly argued that the full reconveyance fees were disclosed; the federal courts dismissing those cases adopted the title companies' reasoning. *See McFerrin v. Old Republic Title, Ltd.*, No. C08-5309BHS, 2009 WL 2045212, at *2 (W.D. Wash. July 9, 2009) (Ex. A-800) ("The HUD-1 document disclosed a $300 reduction in the amount due to Plaintiffs because of a 'reconveyance fee to The Post Closing Dept.'"); *Cornelius v. Fid. Nat. Title Co. of Washington*, No. C08-754MJP, 2010 WL 1406333, at *2 (W.D. Wash. Apr. 1, 2010) (Ex. 703) ("Each of the Plaintiffs signed one of these documents; each HUD-1 disclosed an escrow closing fee and a separate reconveyance fee payable to PCD."). Homeowners themselves, including Scott Whitmarsh and James Eckrich, testified in the government's case that they were never cheated or lied to.

Nor was there evidence that homeowners did not get the service they paid for. Contrary to the government's implication that PCD was like a courier service that took money

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

and "just abscond[ed] with it, never having intended to deliver anything," Calfo Decl., Ex. A (Apr. 13, 2016, Trial Tr. at 80:15–22) (cross-examination of Mark Schedler), the evidence was undisputed that PCD in fact performed the service it was paid to do. Each of the homeowner witnesses testified that their reconveyance had been completed as promised. As Patty LeVeck testified, homeowners received a valuable service in exchange for the fee they paid to PCD. Calfo Decl., Ex. C (Mar. 23, 2016, Trial Tr. at 32:12–18). This was consistent with the positions taken by the title companies in the class actions: "PCD performed a service to earn the $135 fee," and "while Plaintiffs [i.e., Fidelity's customers] paid a fee to PCD, they received a service in exchange and thus were not harmed." Calfo Decl., Ex. E (Mar. 24, 2016, Trial Tr. at 47:18–48:3, 59:4–7) (testimony of Fidelity's attorney, Erica Calderas); Ex. A-705, p. 8 (Fidelity's Motion for Summary Judgment in *Cornelius v. Fidelity*); Ex. A-704, p. 9 (Fidelity's Reply in Support of Motion for Judgment on the Pleadings in *Cornelius v. Fidelity*). The possibility that homeowners could have received the same service for a lower price does not mean that the higher price was theft. The homeowners were not defrauded into consenting to the transfer of the money; they received the benefit of their bargain.[2]

The evidence showed that the reconveyance fees were properly disclosed to the homeowners, that the homeowners consented to pay the fee to PCD, and that the homeowners got the benefit of their bargain by receiving a service from PCD. When the owners of the money—the homeowners—consented to pay it to Mr. Kelley at closing, they ceased to own it.

[2] The evidence was also insufficient to show that the title companies owned the money. Both Fidelity and Old Republic denied that they had *any* right to the money they gave Mr. Kelley from escrow. Julie Yates of Fidelity testified that it was the homeowner's money being paid to PCD, not Fidelity's:

> Q: It wasn't Fidelity's money, whether it was $405 or it was $15? It wasn't Fidelity's money, correct?
> A: That's correct. It was always the borrower's money.

Calfo Decl., Ex. F (Mar. 17, 2016, Trial Tr. at 41:18–20). *See also id.*, Ex. G (Mar. 17, 2016, Trial Tr. at 83:23–25) (testimony of Carl Lago of Old Republic that "it is not [Old Republic's] money"); *id.*, Ex. C (Mar. 23, 2016, Trial Tr. at 26:18–19) (testimony of Patty LeVeck of Old Republic that the money was not Old Republic's money); Ex. A-316 (Old Republic's answers to requests for admission in *Old Republic v. Kelley*, disclaiming ownership of the funds). The government itself acknowledged that the reconveyance fees were "originally the borrowers' money." Calfo Decl., Ex. H (Apr. 20, 2016, Trial Tr. at 3:20–4:3) (government's rebuttal).

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

The money therefore, as a matter of law, "cannot be considered 'stolen.'" *Bennett*, 665 F.2d at 22. Because no rational juror could have concluded that the evidence was sufficient beyond a reasonable doubt to find Mr. Kelley guilty on Count 1, *see Katakis*, 800 F.3d at 1023, acquittal is required.

**3. The Evidence Was Insufficient To Convict Mr. Kelley for Money Laundering.**

Mr. Kelley was charged in Counts 6–10 with laundering money that represented the proceeds of mail or wire fraud. Under the instructions provided to the jury, the government had to prove that Mr. Kelley committed mail or wire fraud in violation of 18 U.S.C. §§ 1341 or 1343 by "knowingly participat[ing] in or devis[ing] a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." Instruction No. 21.

The government based its fraud theory on the stolen property charge, arguing that the two sets of charges were intertwined: "In this case the scheme to defraud or the false statements are the same scheme alleged in Count 1." Calfo Decl., Ex. I (Apr. 20, 2016, Trial Tr. at 27:20–28:1) (government's closing argument). Counts 6–10 therefore fall along with Count 1.

A defendant may only be convicted of mail or wire fraud where he intended "to obtain money or property *from the one who is deceived*." *United States v. Lew*, 875 F.2d 219, 221 (9th Cir. 1989) (emphasis added). The government did not attempt to argue that Mr. Kelley defrauded the homeowners; as explained above, the full reconveyance fee was disclosed to the homeowners and they agreed to pay it. *See Bennett*, 665 F.2d at 22.

To prove that Mr. Kelley defrauded the title companies, the government had to prove beyond a reasonable doubt that the title companies had an ownership interest in the property they gave to Mr. Kelley. *See Cleveland v. United States*, 531 U.S. 12, 15 (2000) ("It does not suffice, we clarify, that the object of the fraud may become property in the recipient's hands;

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

for purposes of the mail fraud statute, the thing obtained must be property in the hands of the victim."); *McNally v. United States*, 483 U.S. 350, 358 n.8 (1987) ("[T]he mail fraud statute . . . had its origin in the desire to protect individual property rights, and any benefit which the Government derives from the statute must be limited to the Government's interests as property holder."); *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924) ("[The] words 'to defraud' . . . refer . . . to wronging one in his property rights by dishonest methods or schemes."); *United States v. Milwitt*, 475 F.3d 1150 (9th Cir. 2007) (reversing conviction for bankruptcy fraud under 18 U.S.C. § 157 where the people who were deceived—the tenants on whose behalf defendant filed sham bankruptcy petitions—were not the people whose property rights were interfered with—the tenants' landlords who were left unable to collect rent).

The government argued that the only persons to whom Mr. Kelley allegedly lied were the title companies: Old Republic and Fidelity, even arguing in closing that "Mr. Kelley lied to escrow companies to get them to give him millions of dollars of borrowers' money." Calfo Decl., Ex. H (Apr. 20, 2016, Trial Tr., at 2:10–12) (government rebuttal). But the government presented no evidence that the title companies had *any* property interest in the reconveyance fees. Both Old Republic and Fidelity denied any ownership of the fees of which they were allegedly defrauded; the owners themselves consented to the transfer of the funds. As with Count 1, no rational juror could have concluded that the evidence was sufficient beyond a reasonable doubt to find Mr. Kelley guilty. Mr. Kelley is entitled to acquittal on Counts 6–10.

### C. The False Declaration Alleged in Count 2 is Legally Insufficient to Sustain a Conviction.

Count 2 charges Mr. Kelley with making a false declaration in violation of 18 U.S.C. § 1623 based on two utterances of a statement—once in a deposition, then again in a declaration. But the government is not permitted to bring a false declaration charge under 18 U.S.C. § 1623 based on a declaration filed with a court. In *Dunn v. United States*, the Supreme Court held unequivocally that Section 1623 does not "encompass statements made in

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

contexts less formal than a deposition." 442 U.S. 100, 113 (1979). Whether a statement is sufficiently formal under 18 U.S.C. § 1623 is a legal question and is appropriately decided on a motion to dismiss. *United States v. Benevolence Int'l Found., Inc.*, No. 02 CR 414, 2002 WL 31050156, at *2 (N.D. Ill. Sept. 13, 2002).

Courts interpreting *Dunn* have routinely rejected false declaration charges premised on statements made in sworn declarations or affidavits. *See, e.g.*, *id.* at *7–8 (collecting cases and dismissing indictment based on "out-of-court declarations made by [defendant's CEO], signed under penalty of perjury, and attached to memoranda filed by [defendant] in support of a motion for a preliminary injunction in a civil case" because "*Dunn* makes clear that this was not a context as formal as a deposition"); *United States v. Savoy*, 38 F. Supp. 2d 406, 411–12 (D. Md. 1998) (dismissing false declaration count based on affidavit of a witness submitted in opposition to a motion for a protective order and injunctive relief); *United States v. Lamplugh*, 17 F. Supp. 2d 354, 357 (M.D. Pa. 1998) ("[T]he United States Supreme Court has unequivocally stated that an individual may not be prosecuted under § 1623 for submission of a false affidavit to a federal district court."). Indeed, the Department of Justice's own Criminal Resource Manual understands *Dunn* the same way: "a false affidavit submitted to a Federal court in support of a motion to dismiss [can] not be prosecuted under Section 1623 because the affidavit lack[s] the formality required of court proceedings or depositions." DOJ Criminal Resource Manual § 1749 (Oct. 1997), *available at* https://www.justice.gov/usam/criminal-resource-manual.

Because the alleged false declaration was made in a written declaration in support of a motion in a civil case, and not in a deposition or similarly formal setting that portion of Count 2 was insufficient as a matter of law. The Court should acquit Mr. Kelley.

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

## D. Count 12 Is Time-Barred.

Mr. Kelley was charged in Count 12 with filing a false Return of Partnership Income for United National for the calendar year 2008, which he filed on October 9, 2008. SI ¶ 146. The statute of limitations for such alleged violations is six years, and runs from the date the tax return is filed or the date it is due, whichever is later. 26 U.S.C. § 6513(c)(1); *United States v. Habig*, 390 U.S. 222, 225 (1968). The government returned its first indictment on April 15, 2015. While United National's tax return would, under ordinary circumstances, have been due on April 15, 2009 (within the statute of limitations), 26 C.F.R. 1.6031(a)-1(e)(2), United National terminated its partnership on August 11, 2008, making its tax return due on December 15, 2008—outside the statute of limitations. *Id.* Count 12 is therefore time-barred.

Because the statute of limitations is an affirmative defense, Mr. Kelley bore the initial burden of proof. *Smith v. United States*, 133 S. Ct. 714, 720 (2013). But once Mr. Kelley made a *prima facie* case that Count 12 was barred by the statute of limitations, the burden shifted to the government to rebut his affirmative defense. *See United States v. Lothian*, 976 F.2d 1257, 1261 (9th Cir. 1992) ("[B]ecause due process requires that the government prove each element of the offense beyond a reasonable doubt, once the defendant introduces sufficient evidence to make a prima facie case of withdrawal, the burden shifts to the government to prove beyond a reasonable doubt that the defendant did not withdraw."); *United States v. Ingman*, 426 F.2d 973, 976 (9th Cir. 1970) (same regarding affirmative defense of insanity).

A partnership terminates for tax purposes when all "operations of the partnership are discontinued and no part of any business, financial operation, or venture of the partnership continues to be carried on by any of its partners in a partnership." 26 C.F.R. § 1.708-1(b)(1). It is undisputed and indisputable that by August 11, 2008, at the latest, United National had discontinued its operations and distributed all of its assets to its partners. *See*

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

Dkt. No. 87, p. 1; Superseding Indictment ¶¶ 65, 70 (alleging distribution of assets and discontinuation of business, respectively); Ex. 2009 (United National's 2008 tax return). Mr. Kelley thus presented a *prima facie* case that United National terminated by August 11, 2008, and that its 2008 tax return was therefore due more than six years before the government brought its indictment. *See generally* Dkt. Nos. 70, 87.

The government sought to rebut this *prima facie* case by arguing that United National's affairs were not properly wound up and thus that United National was not (ever) terminated for federal tax purposes. The government's argument relies on its assumption that United National's assets were not distributed to its partners in strict accordance with those partners' ownership percentages. As a factual matter, this argument was undermined by the government's own tax expert, Paul Shipley, who testified that Mr. Kelley could not take business expenses because the business was terminated, stating: "Well, he filed the final return for United National. I don't know – That sounds like a termination of the business." Calfo Decl., Ex. J (Apr. 12, 2016, Trial Tr. at 50:25–51:6). In the tax return to which Mr. Shipley was referring, Exhibit 2009, Mr. Kelley had indicated that the Schedule K-1 for each of the partners was the "Final K-1" and that the ending share of profit, loss, and capital for the limited partners was 0%, suggesting that it was in fact properly wound up.

More fundamentally, though, the government's argument fails as a legal matter. Whether United National's assets were distributed in accordance with the partners' ownership percentages does not affect whether it was properly wound up. Dissolving partnerships are not required to distribute their assets based solely on ownership percentages. "For Federal tax purposes, Congress has given the partners of a partnership broad authority to negotiate the terms of their business relationship, including the terms governing their business's formation, operation, and dissolution, so as to achieve simplicity, flexibility, and equity as between the partners." *Harbor Cove Marina Partners Partnership v. Comm'r of Internal Revenue*, 123

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

T.C. 64, 84 (2004); *see also Kresser v. Comm'r of Internal Revenue*, 54 T.C. 1621, 1630–31 (1970) ("[P]artners may readjust their respective partnership shares of income and . . . effect will be given to the partners' agreement and their modifications thereof."). Given this flexibility, the fact that the vast majority of the partnership assets were transferred to United National's general partner Blackstone—rather than to the partners according to their respective original ownership percentages—can only be deemed improper winding up for tax purposes if it was not "in accordance with the partnership agreement." *Harbor Cove*, 123 T.C. at 84.

The government did not present any evidence showing that United National's dissolution was inconsistent with its partnership agreement. The government did not even introduce United National's agreement into evidence. The government did not introduce any subsequent agreements between its members concerning distribution of assets upon dissolution. The government did not introduce any evidence that any partner objected to how United National distributed its assets and did not present testimony from any of the partners in United National suggesting that they did not receive their agreed-upon share. *Compare Harbor Cove*, 123 T.C. at 83 (holding that a partnership was not properly wound up for tax purposes where a minority partner was "legitimately challenging the procedures used by the managing general partner in winding up the partnership's business" and the "lawsuit could reasonably lead to [the partnership's] reporting in a subsequent year of significant income, credit, gain, loss, or deduction.").

In short, the government did not introduce any evidence to rebut Mr. Kelley's *prima facie* case that United National terminated at the latest by August 2008 and that the statute of limitations had therefore run. The evidence was insufficient to sustain a conviction, and acquittal on Count 12 is required.

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

## III. CONCLUSION

For the foregoing reasons, Mr. Kelley respectfully requests that the Court enter a judgment of acquittal on all remaining counts.

DATED this 24th day of May, 2016.

CALFO HARRIGAN LEYH & EAKES LLP

By *s/Angelo J. Calfo*

Angelo J. Calfo, WSBA #27079
Patricia A. Eakes, WSBA No. 18888
Emily Dodds Powell, WSBA #49351
Andrew R.W. Hughes, WSBA #49515

999 Third Avenue, Suite 4400
Seattle, WA 98104
Telephone: (206) 623-1700
Email: angeloc@calfoharrigan.com
peakes@calfoharrigan.com
emilyp@calfoharrigan.com
andrewh@calfoharrigan.com

*Attorneys for Defendant Troy X. Kelley*

DEFENDANT'S RULE 29 MOTION FOR ACQUITTAL - 14

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

## CERTIFICATE OF SERVICE

I hereby certify that on May 24, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| Andrew C. Friedman | andrew.friedman@usdoj.gov |
| Arlen R. Storm | arlen.storm@usdoj.gov |
| Katheryn Kim Frierson | katheryn.k.frierson@usdoj.gov |
| Richard E. Cohen | richard.e.cohen@usdoj.gov |

*s/Susie Clifford*

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717